REBECCA LAUGHLIN, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Kansas City Court of Appeals, June 13, 1910.

1. **CONTRIBUTORY NEGLIGENCE: Railroad Tracks.** A railroad, whether main line or switch track, is a place of danger, and a person walking on or across the same who relies for his protection on the railroad company giving him warning signals, or who permits himself to become absorbed in thought and to forget his surroundings, is guilty of negligence.

2. ———: **Humanitarian Doctrine.** The humanitarian doctrine has not destroyed or weakened the effect of contributory negligence; and where it appears that the contributory negligence of an injured person continued to the end as a proximate cause of his injury, there can be no recovery for such injury.

3. ———: ———. The humanitarian doctrine allows a recovery in cases where the injured person through negligent oblivion to danger has voluntarily imperiled himself, and the defendant, knowing or having reason to know of the peril in time to prevent the injury, wantonly or negligently fails to prevent such injury. Under this doctrine the law takes the injured person at the initial moment of his peril, regardless of whose fault produced that peril and requires the defendant to use reasonable care to discover such peril and then to avoid the injury. In such a case contributory negligence is no defense.

4. ———: ———. Ordinarily one person is not required to anticipate that another will act negligently, but where trainmen have reason to expect to find persons on or dangerously near their tracks, they must keep a lookout and use reasonable care to prevent injury to such persons.

5. ———: ———. Deceased was standing or walking on a track over which a train was switching cars. He was oblivious to his peril. He was struck by a car being "kicked" on the track on which he was. There was evidence tending to show that the brakeman on the car was not at the brake, and was not watching the track in front of his car, and that no signal was given of the approach of the car. Under the evidence in this case the deceased was guilty of negligence, and therefore the failure of the enginemen to ring their bell, to the extent that it operated to place deceased in a position of peril, was offset by his own negligence. But under the humanitarian doctrine it was for the jury to say whether or not the brakeman or enginemen were negligent in failing to keep a proper lookout, and whether, if they had kept such lookout they could have stopped the car, or warned deceased by vocal outcry, or otherwise, and thereby have prevented his injury.

6. ———: ———: Instructions. The instructions in this case failed to confine the issues of fact to those belonging exclusively to negligence under the humanitarian doctrine, and were therefore erroneous.

Appeal from Jasper Circuit Court.—*Hon. Howard Gray*, Judge.

REVERSED AND REMANDED.

*L. F. Parker, J. B. Todd* and *Woodruff & Mann* for appellant.

(1) The deceased was guilty of such contributory negligence in going upon defendant's track in its switch yard, while its engine and cars were engaged in switching thereon, in plain sight and hearing, without taking any precaution whatever for his own safety, as to defeat a recovery. Davies v. Railroad, 159 Mo. 1; Powell v. Railroad, 76 Mo. 80; Malow v. Railroad, 84 Mo. 270; Maxey v. Railroad, 113 Mo. 1; Boyd v. Railroad, 105 Mo. 371; Sims v. Railroad, 92 S. W. 909; Clancy v. Railroad, 91 S. W. 521; Tanner v. Railroad, 161 Mo. 497. (2) The testimony shows that the engineer in charge of the train could not, on account of the curve in the track, see the peril of the deceased. The fireman

was shoveling in coal. The witness Roark on the fireman's seat, keeping a sharp lookout, did not have time after discovering deceased on the track to call to the engineer before the collision which at once followed. But even if defendant was negligent, the negligence of the deceased was not only concurrent but contemporaneous and coincident with his injury, and there is no room for the interposition of the humanitarian doctrine. Reis v. Transit Co., 179 Mo. 1; Schmidt v. Railroad, 90 S. W. 136; Gettys v. Railroad, 103 Mo. App. 564; Ross v. Railroad, 113 Mo. App. 600; Sims v. Railroad, 92 S. W. 909; Moore v. Railroad, 176 Mo. 528. (3) In no event, upon any theory, could defendant be held liable for the death of deceased, except upon proof that the car could have been stopped in time to avoid the injury, and the burden is on plaintiff to affirmatively show this. All the evidence offered by plaintiff is to the contrary, there being no evidence whatever as to what distance, by the exercise of ordinary care, the car could have been stopped. Moore v. Railroad, 176 Mo. 528; Roenfeldt v. Railroad, 180 Mo. 554; Moore v. Railroad, 28 Mo. App. 622; Ross v. Railroad, 113 Mo. App. 600. (4) It requires more than the showing of a mere possibility that the accident might have been averted to bring the case within the operation of the last chance doctrine. Markowitz v. Railroad, 186 Mo. 350; Roenfeldt v. Railroad, 180 Mo. 554; Browning v. Railroad, 106 Mo. App. 729. (5) Even if it be conceded that deceased was not a trespasser on defendant's cut off track in the switch yards, yet he was familiar with the yards and the purposes for which they were used, and the train crew were not bound to anticipate his presence on the track. There is no liability until it is affirmatively shown that they might have averted the accident after they actually saw and knew of the danger of the deceased. Loring v. Railroad, 128 Mo. 359; Zumalt v. Railroad, 175 Mo. 318. (6) The brakeman was not then negligent in failing to give warning

or signal to stop. Lennon v. Railroad, 94 S. W. 975; Schmidt v. Railroad, 90 S. W. 136; Guyer v. Railroad, 174 Mo. 350.

*George Hubbert* and *A. D. Bennett* for respondent.

JOHNSON, J.—This suit is prosecuted by the widow of Charles B. Laughlin, deceased, to recover damages for the death of her husband which she alleges was caused by the negligence of defendant. A trial to a jury resulted in a verdict for plaintiff in the sum of five thousand dollars. Later, a remittitur of five hundred dollars was filed by plaintiff in the circuit court and judgment was entered in her favor for forty-five hundred dollars. An appeal was allowed defendant to this court. We transferred the case to the Supreme Court on jurisdictional grounds, but that court retransferred it, and the cause is before us for determination.

Laughlin was killed in the forenoon of November 5, 1903, on a switch track at defendant's station in Seneca by being struck by a loaded freight car which defendant was switching to the place on a team track where it was to be unloaded. We find the pleadings sufficiently present the issues we shall discuss in passing on the demurrer to the evidence which defendant argues should have been given. The learned trial judge refused the demurrer and sent the case to the jury on the theory that while the peril which resulted in the death of the unfortunate man was created by the cooperation of his own negligence with negligence of defendant, the evidence disclosed facts and circumstances from which the jury might reasonably conclude that the servants of defendant in charge of the car and train to which it belonged should have discovered the peril in time to have saved the endangered man had they been in the exercise of reasonable care, and that they negligently failed to perform the duty imposed on them

under the "humanitarian doctrine" and by such negligence caused the death.

The questions for our determination presented by the demurrer to the evidence are, first: Does the evidence, when considered in the light most favorable to plaintiff, disclose negligence of defendant as a proximate cause of the deadly peril of the decedent? Second: Does such evidence disclose negligence in law of the decedent as a proximate and contributing cause of that peril, and, third, Should these questions be answered in the affirmative (and we think they should be so answered), does the evidence reasonably justify the conclusion that the negligent acts which produced the peril were followed by the negligent breach by defendant of a humanitarian duty it owed the decedent?

Pertinent facts disclosed by the evidence thus may be stated: Laughlin was the local manager at Seneca of the business of a St. Louis concern which operated a grain elevator at that place and was inspecting a car of corn that had just been set in on the elevator track. The buildings comprising the elevator plant were about eighty feet north of defendant's main line, which "passes" through Seneca in an easterly and westerly direction. A switch track for the service of the elevator ran along the south line of these buildings so close to them that a grain car set by the elevator would be too close for a person to pass between the car and the building. Consequently, when Laughlin inspected the grain in the car, he had to enter from the south door and in going from his office to the car, necessarily had to cross the elevator track which was part of the main switch track maintained by defendant on the north side of its main line. This switch track was about eighteen hundred feet long and each end was joined to the main line. The elevator was about eight hundred feet from the east end. At a point just west of the southwest corner of the elevator another switch track called the cut-off track diverged from the main switch track and ran

southeasterly by reverse curves to a junction with the main line. The connection with the main line was about four hundred feet west of the junction of the main switch track with the main line. We shall call that part of the main switch track east of the cut-off switch the elevator track and that part west of that point, the house track, though as we have shown, the two form but one continuous track.    In its whole course this track passes a warehouse, a flouring mill and another elevator, but it crosses no public street or alley.    The subjoined plat fairly presents the main features of the locality under consideration.

Laughlin v. Railroad.

"A" represents the car of corn which Laughlin was inspecting; "B" is the cut-off track; "D" is a dust house which is connected with the elevator by an overhead dust pipe. "S" represents track scales which were about one hundred and fifty feet east of the point where Laughlin was killed. There was a clear space—perhaps five or six feet—in a slight depression between the car of corn and the cut-off track. The elevator was not running and had not been for sometime. The car of corn we have been talking about was the first of that season's crop to arrive and Laughlin had gone to the depot to see if it would be brought in by the local freight train from the west. The car was in that train and Laughlin talked with both the agent and the conductor about it. The car was disconnected from the rear part of the train and with the cars in front was pulled by the engine to the east end of the main switch. The train then was backed westward on the elevator track and the car was "spotted" at the place shown on the diagram. The conductor and Laughlin walked over to where the car was set, and the rear brakeman opened the car doors for Laughlin. The conductor then went back to the main line and the brakeman went back to the train attached to the engine. This train pulled east on to the main line, then backed on the cut-off switch past the point opposite the car of corn, then pulled down to the main line, backed to make a switch, pulled east again and backed in a second time on the cut-off switch for the purpose of "kicking" a car of merchandise on to the house track. The operation consumed from five to ten minutes. In the meantime, Laughlin and an assistant, a Mr. Harmon, proceeded to inspect the corn. Harmon entered the car and handed samples out to Laughlin who stood in the clear in the depression between the elevator and cut-off track. While in the car, Harmon could not see Laughlin, but conversed with him about the quality of the corn and knew from the sound of his voice during the conversation that

Laughlin stepped away from the car door, but did not know whether or not he had stepped back to the cut-off track. In leaving the car, Harmon, just as he jumped to the ground, felt the vibrations of the train approaching from the east. Immediately he looked around and saw Laughlin standing in the middle of the cut-off track with his back to the train. He also saw the train coming at a speed of twelve to fifteen miles per hour. He shouted "Look out, Charlie," and gave stop signals with his arms. He does not say how far the merchandise car was from Laughlin when he first became aware of the situation, but he shouted and signaled at once and it is clear that Laughlin could not escape. We quote from his testimony:

"He (Laughlin) didn't really see anything coming or realize his danger to my knowledge; he didn't act so when I hollered at him; he turned to look or turned his head and attempted to get away and didn't. . . . If he said anything I didn't hear it. . . . I imagined I heard him say 'Oh' as he attempted to jump. . . . The drawhead struck him somewhere about the middle of the back . . . and knocked him some fifteen feet . . . doubled him up and rolled him under the car."

The bell was not rung nor the whistle sounded as the train approached. The brakeman was on top of the merchandise car but there is evidence to show that he was not at the brake, but was standing in the middle of the car looking southward. The engineer was in his seat on the south side of the cab and on account of a curve in the track his vision was obstructed by the train which consisted of four or five freight cars. The fireman was shoveling coal and, therefore, was not on the lookout. His seat in the cab was occupied by the witness Roark, a boy eighteen years old who, as a friend of the fireman, had been permitted to ride on the engine while it was switching. This young man introduced

144 App—13

as a witness testified on direct examination, that when he first noticed, Laughlin was standing in the middle of the track shelling some corn and facing the southwest. The engine was just going in on the cut-off track. The brakeman was standing on top of the merchandise car about the middle, looking south. Witness continued to look "for about ten seconds." The merchandise car shut off his view but he could tell from the frantic actions of Harmon that Laughlin had been hit.

"Q. Now, about how far was the train from Mr. Laughlin when you first saw him? The Court: This car they were kicking in (the merchandise car) the nearest end of that car from him? A. About twenty feet. Q. How can you determine that distance—have you any way of determining it? A. No, sir." Further, witness said that when he first saw Laughlin the end of the merchandise car "was a little beyond (west of) the scales, I believe . . . not very far, though." On cross-examination: "Q. Now you say when you saw Mr. Laughlin you had a clear view of the track as you backed in there? A. Yes, sir.

"Q. You were facing that way? A. Yes, sir.

"Q. When you saw Mr. Laughlin, the car was about twenty feet of him? A. Yes, sir.

"Q. The rear of the car? A. Yes, sir.

"Q. You say you saw him about ten seconds, that is just to guess at it? A. Yes, sir.

"Q. Now, when you saw him you paid more attention to him, didn't you, than you did to the scales? A. Yes, sir.

"Q. You saw him and your attention was attracted towards him? A. Yes, sir.

"Q. The rear end of the car had passed beyond the scales? A. Some, not much.

"Q. Between him and the scales? A. Yes, sir.

"Q. Now, you just guessed it was enough beyond the scales, it was about twenty feet of him? A. Yes, sir; just about.

Laughlin v. Railroad.

"Q. Almost instantly after you saw him, it struck him? A. Yes, sir; just about.

"Q. You think about long enough to count ten? A. Yes, sir; I guess so; a little longer than that.

"Q. Did you have time to tell the engineer about him? A. No, sir.

"Q. Did you tell the engineer? A. No, sir.

"Q. You didn't have time to do it? A. No, sir.

"Q. It struck him before you could tell the engineer of the danger? A. Yes, sir.

The brakeman introduced as a witness by defendant denies that he was inattentive to the way in front. He testified that when he first went in on the cut-off track he observed Laughlin in the clear between the two tracks, "Kind of walking down west a little. Q. Well, then what happened? A. Well, we was trying to kick the car back; I was giving the engineer a sign to kick it back, because there is a kind of a little rise in the track where the mill is now, not the elevator but the mill; there was a kind of little lump in there and we wanted to give it hard enough kick so as to kick it back to where they had been unloading, for teams to get to it, and we run up pretty near to that spout that runs out there (the overhead dust pipe) and I dodged down out of the way of that, and about the time I raised up I felt it hit something, and I set this brake and gave the sign to stop at the same time—I gave the stop sign at the same time I set the brake.

"Q. How long before you dodged under that spout had you seen Mr. Laughlin? A. I don't know; it was only about a second or two.

"Q. Where was he then? A. In between the tracks, shelling this corn.

"Q. You don't mean in between the rails? A. No, sir.

"Q. In between the cut-off and mill track? A. Yes, sir.

"Q.  In the clear?  A.  Yes, sir.

"Q.  Then you dodged under this spout?  A. Yes, sir.

"Q.  When you straightened up what happened? A.  I felt the car hit something, and I gave the stop sign and set the brake."

On cross-examination: "Q.  The last time you saw him, he was moving as you described awhile ago, going westward?  A.  Yes, sir; he was moseying along, we would call it.

"Q.  What did you do, if anything, or see anybody else do or hear done for the purpose of giving any warning then?  A.  At what time?

"Q.  At the time you saw him going westward moseying along?  A.  Warning for what cause?

"Q.  For any cause?  A.  There was no warning, no, sir."

The Court: "What did you see or hear?  A.  I saw Mr. Laughlin down there in the clear.

"Q.  If you want to give a man a warning, you sometimes sound a whistle or sometimes ring a bell; were those warnings given—any warning of any kind; did you up there give any warning?  A.  No, sir; I just give a sign to kick that back."

At the time Laughlin was struck the merchandise car had been uncoupled from the train but was still being pushed or "kicked."  There is no evidence to support an inference that it was necessary for Laughlin to be on the cut-off track while inspecting grain in cars "spotted" at the elevator.  On the contrary, the evidence shows that the clear space between the two tracks was sufficient for all reasonable and usual purposes. Further, it appears that in going from the car to his office, he was not compelled to go on to the cut-off track.  Other facts are in evidence, but those stated control the determination of the questions arising under the demurrer to the evidence.

That negligence of Laughlin was a proximate cause of the peril in which he was involved when the eyewitnesses discovered him in the middle of the cut-off track is a proposition too plain for argument. Evidently he had become engrossed in his work, had forgotten about the train, had started to walk slowly westward and had stepped to the cut-off track from a place of safety without looking in the direction of the approaching train. A railroad track, whether it be a main line or a switch track is a place of danger and of itself is a danger signal, and a person to remain within the domain of reasonable care must employ his senses to ascertain if the track be clear before he attempts to cross it or to use it as a footpath. He must not rely on the presumption that warning signals will be given of the approach of a train nor must he suffer himself to become so absorbed in thought as to forget his surroundings. These rules have been declared and followed so often in cases of this character and are so well known that it would be useless to refer to the authorities.

The contributory negligence of Laughlin which, as we have said, is indisputable in legal effect, deprives plaintiff of any cause of action based on negligence of defendant which merely conduced to place the unfortunate man in a position of peril. It must not be inferred that the common law force and effect of contributory negligence has been impaired, much less emasculated, by the principles and rules of the humanitarian doctrine. As a defense, it is as virile today as at any time in the history of our jurisprudence, and where it appears that contributory negligence continued to the end to operate as a proximate cause of the injury, there can be no recovery. The culpability of the injured person is held to cancel that of the defendant.

But modern methods and instruments of transportation developed a class of personal injury cases in which it became apparent that the contributory negli-

gence of the plaintiff, while co-operating to place him in a perilous situation, did not continue as a proximate cause of the injury but was superseded in the chain of causal events by the sole negligence of the defendant. In other words, after the plaintiff through negligent oblivion to danger had voluntarily imperilled himself, the defendant, with knowledge of the peril and with opportunity to avoid the injury, had wantonly or negligently run the plaintiff down. Obviously, not only was it a logical solecism to say that the contributory negligence in such cases was a proximate cause of the injury, but the results of such doctrine would be so barbarous and inhuman that no civilized person would think of it as a practical rule of modern jurisprudence. Hence the rise of the humanitarian doctrine which takes the injured person at the initial moment of his peril and, regardless of whose fault brought about the situation, imposes on the defendant the duty of exercising reasonable care, first, to discover the peril and then to avoid the injury. The defense of contributory negligence is not available against an action founded on the negligent breach of such duty. What we have said forces the conclusion that it is immaterial whether Laughlin was induced to go on the cut-off track by the failure of defendant to give warning of the approach of the train. His contributory negligence commingled with all such negligence and deprived it of the element of actionable culpability.

We now take the endangered man at the time when he first passed from a place of safety to one of danger for the purpose of ascertaining whether or not defendant failed in the performance of a humanitarian duty. First, did defendant have any reason to apprehend that persons might be on the switch track over which it was proposed to run the train? It is argued that since this track was in defendant's yard and did not cross any public thoroughfares, the operators of the train had no reason to anticipate the presence of Laughlin

on the track. Though it appears that no necessity existed for Laughlin to go on the cut-off track, he was where he had a right to be while he was inspecting the corn and, considering the close proximity of the cut-off track to the car and the depressed state of the ground between the tracks, it was a natural thing for him to go on the track. His negligence consisted in taking that position without looking for a train. But he was not a trespasser since, as we have said, he was where his business called him, and he merely chose what appeared to be the most convenient place. Not only did that switch track serve a number of industrial concerns as well as those who hauled freight from cars, but it had been customary for employees of the elevator company to inspect grain cars just as Laughlin inspected this car. But more important than all, defendant's trainmen knew that Laughlin and Harmon were inspecting the car and had they thought about it, doubtless would have anticipated that these men might be in such close proximity to the track as to be an object of concern to them. We are mindful of the rule that a person is not required to suppose that another will act negligently in a given situation, but where, as in this case, the trainmen have reason to expect the presence of persons on or dangerously near the track, a duty devolves on them to keep a lookout (Williams v. Railroad, 114 Mo. App. 1; Mann v. Railway, 123 Mo. App. 486), and to act reasonably for the protection of such persons.

The evidence of plaintiff accuses defendant's servants of being remiss in the performance of this duty. The engineer, on account of the curve in the track, had his vision obstructed by the cars, but the fireman (had he been on the lookout) could have seen Laughlin in the act of stepping to the track, and could have warned him with bell or whistle. Being engaged in the performance of another duty, he was not on the lookout. We do not say the fireman was negligent in failing to be

at his seat, since it appears that the work he was doing was necessary, but we do think the triers of fact were entitled to infer that the engine men were negligent in not ringing the bell while running through a switch yard where they had reason to anticipate the presence of persons on or near the tracks. The failure to ring the bell to the extent that it operated to place Laughlin in a dangerous situation was offset by his contributory negligence. Not so with the failure to maintain a lookout. That duty continued after the inception of the danger and its breach was the breach of a humanitarian duty. It appears from the evidence of plaintiff that the brakeman was inattentive. Primarily, it was his duty to be on the lookout. His car was uncoupled and could not be controlled by the engine and it was negligence of a pronounced degree for him to absent himself from his post at the brake and to pay no attention to his way. It appears that as far as the trainmen were concerned, the train was being run wild without thought or care of lives imperilled by such conduct.

This brings us to the most vital and difficult question in the case. Defendant argues that the burden was on plaintiff to show that after the peril became manifest the trainmen had ample means and opportunity to avoid the injury and that the evidence fails to show that such opportunity was presented. They say that for aught that appears, Laughlin did not leave a place of safety until the car was upon him—too late for anything to be done within reason to save him. Harmon noticed from his voice that Laughlin was widening his distance from the car but could not know that he was going on the track. The boy in the engine manifestly was confused in his observations respecting time and distance. He says that ten seconds elapsed from the time he first saw Laughlin in the middle of the track until the blow was struck, yet he says that the interim was too short for him to cry out to the engineer. Further, he says that the end of the car was only twenty

feet from Laughlin when he discovered the peril and then declares that the end was just beyond the scales, which would place it about one hundred and fifty feet away. We do not doubt the sincerity of this witness, and attribute these glaring discrepancies to his youthfulness and to the natural deception of appearances. He was on the engine some three hundred feet from the end of the merchandise car. The track ahead was on a slight curve to the left. Obviously, Laughlin would have been hidden from view by the merchandise car had he been but twenty feet in front of the car, and yet, from the position of the witness, it is easy to understand why he might fall into the error of thinking the distance was much shorter than it really was. The fact that he could see Laughlin beyond the car argues that his statement that the car end was just beyond the scales was approximately correct. We think his testimony, taken as a whole, and giving him credit for sincerity, supports the inference that Laughlin had reached the middle of the track when the car was, at least, one hundred feet away. Further, it is obvious that the first appearance of danger was when Laughlin first turned to go to the track, and this must have been some seconds before he was discovered by the young man. The brakeman says that Laughlin was "moseying along" shelling an ear of corn. He had his back to the train and apparently was preoccupied. Could anyone in the position of the brakeman doubt that when he turned to go to the track he was going obliviously into peril? We think not. We think a reasonably prudent and attentive person in the brakeman's place would have observed the peril at that instant. If the brakeman had done so, Laughlin's life might have been saved. Approximately, the car was moving at a speed of twenty feet per second. It must have been all of one hundred and fifty feet away when the peril began. It might not have been possible to stop the car, but the brakeman could have given vocal warning and he

could have signalled to the engineer in time for the whistle to be blown. We conclude that the evidence in its aspect most favorable to plaintiff demonstrates that the sole proximate cause of the death was the breach by the brakeman of a humanitarian duty to keep a lookout for danger. The demurrer to the evidence was properly overruled.

The second and third instructions given at the request of plaintiff are as follows: "The court instructs the jury that, if you believe from the evidence that Charles B. Laughlin was employed as managing agent of the grain elevator and its business near the railroad switch tracks in. Seneca, Missouri, at the time of his death; and that the defendant company had been accustomed for a long time to haul and deliver grain in cars on said tracks at or near said elevator; and that persons employed about said elevator were and long had been accustomed to be and frequently did get onto said switch tracks in the locality of said grain cars and elevator in the course of the inspection, examination and care of the grain; and that defendant had notified said Laughlin, by its agent, that it would and it did deliver there at said elevator on such track, on November 5, 1903, a car of grain by means of its locomotive and train; and that defendant, by its agents, employees, servants, engineers or some of them, withdrew its said locomotive and train from said switch tracks onto its main line track; and that said Laughlin thereupon went about the receiving and examination of the grain brought in said car, and in doing so got upon one of said tracks in the vicinity of said grain car and elevator, and that, to the knowledge of defendant, its agents, servants or employees, or some of them, such was and had been the usual and accustomed course and manner of receiving and examining and dealing with such cars and grain so delivered there; and that they had reason to anticipate that some person might be on said switch track where said Laughlin was injured, but neverthe-

less immediately and negligently returned and backed said locomotive and a train of cars, or car or cars thereof, onto said switch track from said main line with great speed while said Laughlin was yet there on said switch track, without any note or signal of warning by bell, whistle or otherwise; and that said Laughlin was thereby put in imminent peril of being struck by said car or cars without knowing it, and was in such position on said track and so open to view that his danger and peril was or could have been seen by the persons then running or managing said train for the defendant or some of them, by the exercise of ordinary care on their part in keeping lookout in time to have averted injury to him by the said train or car thereof; and that said Laughlin was then and there struck and killed by reason of such negligence on the part of the defendant company, its agents, servants, engineers, employees or some of them, by defendant's said backing train or car or cars thereof, while the same was being so managed or run by its said agents, servants, engineers or employees, or some of them—then the defendant company must be held liable for negligently causing Laughlin's death.

"The court instructs the jury that, if you believe from the evidence that Laughlin stood on the track near the grain elevator and car where the accident occurred, in an attitude of inattention to and ignorance of his peril from the backing train of cars, yet if you further believe from the evidence that the track was and had been used with the knowledge of the defendant company, its servants or agents, by the managing agent and employees of the elevator company for a long time previous, by their passing, crossing or being on said track, in the usual and ordinary course of gaining access to and dealing with the grain delivered there by defendant in its cars, and that Laughlin was then and there so employed and acting, and was known to defendant's trainmen, or some of them, to be engaged

on that occasion about the recently delivered grain car —then it was the duty of the defendant and its employees in charge of the backing cars to keep lookout in the direction of their movement at the time; and if you further believe that the proper duties or position of the fireman and engineer were such that they could not keep such lookout in that direction under such circumstances, then it was the company's duty to have some other employee in proper position for such lookout, to see whether the track was clear for such backward movement without injury to such elevator employee as might reasonably be expected as liable to be on the track, if any; and if you further believe that by the exercise of ordinary care, the defendant, its agents or employees engaged in operating its train, or some of them, could have discovered the attitude and peril of the deceased, in time to have avoided injury to him by proper control of the cars or car, or by giving such warning signal or alarm as they might have given with the means in their control, if any; and if you further believe that such ordinary care was not used by or in behalf of the defendant company, and that the peril of Laughlin was not so discovered before he was struck or it was too late to avoid the injury—then the defendant must be held to have been negligent of its duty; and if you further believe that the injury and death of Laughlin was occasioned and caused by such negligence of the defendant or its said employees or any of them—then you will find adversely to the defendant as to the cause of Laughlin's death."

A careful analysis of these instructions convinces us they failed to confine the issues of fact to those belonging exclusively to negligence under the "last chance" doctrine, but erroneously submitted negligence which was cancelled by contributory negligence and, consequently, they authorized a verdict for plaintiff on untenable ground. At best this is a very close case for plaintiff and it is with much hesitation we reach

the conclusion to overrule the demurrer to the evidence. As we have shown, the only issue of fact for the jury to determine was whether or not the operators of the train, in the exercise of reasonable care should have known of the peril of Mr. Laughlin in time to have warned him.

Since the evidence clearly establishes the fact of contributory negligence, the instructions for plaintiff should have assumed that contributory negligence aided in the production of the peril and should have presented none but a clear cut issue of humanitarian negligence. Instead they enlarged the scope of legitimate inquiry on the part of the triers of fact and we must assume that the verdict was based, in part at least, on negligence for which defendant would not be liable. It follows that the judgment must be reversed and the cause remanded.

It is so ordered. All concur.