This is an appeal from a judgment. The action is brought in the name of the state on relation of the Workmen's Compensation Bureau, for the use and benefit of the Workmen's Compensation Fund, and Ted A. Byfield, against the appellant railway company and two employees of the latter, Tweeton and Colony. At the trial the action was dismissed as to the individual defendants. One of the use plaintiffs, Ted A. Byfield, in the fall of 1921 was engaged in work upon a certain highway hauling gravel by truck. On the 9th day of November, 1921, he was severely injured when the truck he was driving collided with the engine of a branch line passenger train upon a crossing of the Great Northern Railroad some four or five miles west or northwest of Devils Lake. For this injury he received compensation from the Workmen's Compensation Fund, and this action is brought under the Workmen's Compensation Act of 1919, as amended by chapter 73 of the Laws of the Special Session of 1919, chapter 141 of the Session Laws of 1921, chapter 347 of the Session Laws of 1923 and chapter 219 of the Session Laws of 1925. Section 20 of the act provides that when a compensable injury is sustained under circumstances creating in some other person than the Workmen's Compensation Fund a legal liability to pay damages, the fund shall be subrogated to the rights of the injured employee or his dependents to recover against that person, and further that any excess so recovered above any *Page 404 
award paid or to be paid from the fund shall be paid to the injured employee or his dependents less the expense of the action. The facts necessary to an understanding of the questions presented upon the record may be stated substantially as follows: Ted A. Byfield was employed by Ramsey county as a truck driver hauling gravel upon a road project, as above stated, on the 9th day of November, 1921. As such employee he was insured in the Workmen's Compensation Fund. The gravel pit from which the hauling was done was situated some four miles south and east of a railroad crossing of the defendant railroad which was four or five miles west or northwest of Devils Lake. The gravel was hauled from this pit to a road project which lay north and west of the crossing in question. Byfield had been engaged upon this project in hauling gravel between these points for at least five days, making about eight trips, sometimes less, daily and crossing this particular crossing twice that number of times each day. At about 2:30 o'clock in the afternoon on the day in question, he approached the railroad crossing from the south, driving a loaded 2 1/2 ton Nash-Quad truck. The truck was not equipped with a windshield. There was a top over the driver's seat which did not obstruct the vision ahead but which did, to some extent, obstruct the vision to the sides, there being sloping curtains with slits or openings in them covered with a transparent or semi-transparent substance. The openings were not wide and were somewhat below the horizontal line of vision of the driver as he sat erect in his seat. The seat was of sufficient width to accommodate four persons. The defendant was alone and sat at the extreme left behind the steering wheel which was set horizontal upon a perpendicular shaft. The crossing in question is about 2,000 feet west or northwest of a junction between the Soo railroad and the Great Northern railroad. The Soo line at this point runs east and west and the Great Northern runs northwest and southeast, more west than north, the crossings of the two railroads being some 600 feet apart on the highway in question. Byfield had crossed the Soo railroad, and as he approached the Great Northern he followed a bend in the road upon which he was driving, which was incidental to the road crossing the railway at right angles. For a short distance, therefore, his direction would tend to be parallel with the railroad and his forward view would be to the west or northwest. The wind was blowing from the north or northwest. As he neared the *Page 405 
crossing, there was a rather sharp turn to the right, although photographs clearly indicate that the angle is considerably greater than ninety degrees. The railroad was upon a grade at this point, which the testimony shows to have been 5 1/2 or 8 or 10 feet in height, the latter
[EDITORS' NOTE: PICTURES IS ELECTRONICALLY NON-TRANSFERRABLE.]
figures being estimates or guesses, the first purporting to be an accurate measurement. At the time of the accident, the Great Northern line at this point was double tracked. Going up the incline, the driver *Page 406 
shifted his truck into low gear and crossed over the first track in safety. As he approached the second track a train coming from the east, upon his right, struck the front end of his truck causing the injury in question. The photographs in evidence show the crossing to be of ordinary construction with planks on either side of each rail with a fill or partial fill between the planks. Looking from the railroad crossing eastward, or southeasterly along the line of the Great Northern railroad, there is no obstruction to the vision until the eye reaches a tower located near the intersection of the Soo and Great Northern, a distance of a quarter of a mile or more. There is in the vicinity of the tower, that is, within 100 feet or so of the tower, a slight cut where the rails of the Great Northern railroad are not distinctly visible, but for this distance there is nothing to obstruct the vision of an approaching train.
With reference to signals, the evidence is in conflict. The fireman, who sat upon the south side of the engine, in a position from which he was able to observe this and another truck following it as they approached the crossing, testifies that he told the engineer of their presence and that the engineer immediately applied the air brakes; that he, the fireman, kept watching the trucks and presently observed that the one in question had stopped at about the first track or south of the track, whereupon he communicated this fact to the engineer who released the brakes. Later, the fireman says, he saw it start again and he notified the engineer who again applied the brakes and gave a stock or alarm whistle. This was less than 125 feet from the crossing and the application at this point could not and did not suffice to avoid the collision. The train consisted of an engine and three cars and it stopped with the rear end at the crossing or a little beyond it. He further testifies that the whistle was sounded upon the approach to the junction of the Soo and again at the whistling post for this particular crossing. The engineer's testimony coincides with that of the fireman, except as to the actual observation of the trucks which he could not see by reason of being on the opposite side of the engine. The testimony of the express messenger, of an immigration officer who was riding in the baggage car, and of passengers upon the train likewise is to the same general effect. On the other hand, the plaintiff testifies that he heard no whistle and no bell, and one Mitchell, a co-employee similarly engaged in driving another truck which was immediately behind that of *Page 407 
Byfield, testified that he heard no whistle or no bell and did not see the train. (The only reasonable inference from all the evidence is that this testimony relates to the regular crossing whistle and not the alarm whistle.) The witness Keipner, another co-employee, who was making a return trip and approaching the crossing from the opposite side, testified that he had stopped on the opposite side to await the crossing of the two trucks approaching from the south, that he was listening and that the whistle was not blown for the crossing and the usual warnings not given. The witnesses are well agreed that the alarm or stock whistle was sounded immediately before and during and after the impact. As to the condition of the crossing, there is testimony, on behalf of the plaintiff, to the effect that it was rough and a hard crossing to cross; that the incline of the approach was steep; that it required the truck drivers to shift into low gear; that, in ascending the incline, loaded trucks, which upon a level road would make from 12 to 15 miles an hour in high gear, would be compelled to shift to low gear and go at the rate of about 3 miles per hour. Both Byfield and his co-employee, who drove the second truck, testify that the trucks did not stop as they approached the crossing; they likewise testify to the vision of the track being obstructed by a cut, but the photographs, those introduced on behalf of the plaintiff, as well as those introduced by the defendant, and the other testimony in the case, locate this cut, beyond peradventure, near the tower house at the junction, which is over a quarter of a mile from the crossing, and they likewise show that it is not of sufficient depth to obscure an approaching train from the view of one approaching the crossing. The witness Mitchell likewise testifies to an obstruction occasioned by some trees along the right of way, but the same photographs clearly indicate the location of the trees in question as being on the south side of the right of way of the Soo track; consequently they did not and could not have obstructed the vision of an approaching train from the east at any time after the Soo track was crossed some 600 feet before reaching the crossing in question.
At the time the trucks were first observed by the fireman, the speed of the train was about 35 miles per hour. The engineer applied the air brakes, slowing the train down considerably and later, acting upon the information communicated by the fireman that the trucks had stopped, he released the brakes, but insufficient time had elapsed between *Page 408 
the releasing of the brakes and the second application near the crossing to restore the air pressure needed for a quick stop.
The principal questions argued upon this appeal are the negligence of the defendant, the contributory negligence of the plaintiff, and the application of the so-called last clear chance doctrine. Since we regard the question of contributory negligence as controlling, it may be assumed, for the purpose of the opinion, that the testimony was sufficient to form an issue of fact for the jury on the question of negligence consisting in the alleged failure to give proper warning signals.
It will not be disputed that both the railroad company and the general public had equal right to use the crossing in question and neither will it be contended that in the use of the crossing by the defendant company, in the regular operation of its moving trains, it is required to give precedence or right of way to those desiring to cross the crossing on the highway at a given time. The natural and normal use of railway crossings, in the light of the equipment employed upon the railroad track compared to that used upon the highways, suggests that the railway trains must, in cases of conflict, be conceded the right of way. Amenia S. Land Co. v. Minneapolis, St. P. . S. Ste. M.R. Co. 48 N.D. 1306, 189 N.W. 343. If those who operate railway trains were required to slow them down and be prepared to stop at every crossing where an automobile might be crossing within a fraction of a minute of the same time, operation of trains would become impossible. Those who use the highways are, of course, familiar with these common sense requirements and hence must and do know that the approach to a railway crossing is fraught with the danger of being met by trains that can not, in the nature of things, stop within sufficient time to avoid a collision. Hence the law, following dictates of common reason and experience, requires the driver of a truck or automobile, in approaching a railway crossing, to utilize his senses for the purpose of discovering impending danger. While in this state the specific acts of stopping, looking and listening are not necessarily enjoined in all circumstances, (Pendroy v. Great Northern R. Co.17 N.D. 433, 117 N.W. 531), it is nevertheless one's duty to adopt those measures of caution that are reasonably designed, under the circumstances, to apprise him of the danger. He can not, consistent with the exercise of due care for his own safety, fix his eyes upon the road ahead or concentrate upon the *Page 409 
instrumentality — automobiles, truck, tractor or whatnot — that he is driving at the time, to the exclusion of all observation to determine the existence of danger. In the instant case the driver was driving against a wind which would tend to carry away from him the sound of a train approaching from the southeast. The day was clear and his vision unobstructed, except by the truck top, during the whole time he was driving toward the track for at least 600 feet, and he could readily have seen the approaching train anywhere on the track for approximately a third of a mile before it reached the crossing. The principal reason assigned for his failure to see is that the top was up with sloping side curtains on in which the observation slits were so far below his horizontal line of vision that as he looked out he could see only the fence and the grade but not the railroad track. There is no adequate explanation in the record of the failure to utilize the forward vision and the line of vision to the right upon an angle represented by the relative position of his body and the front of the sloping drop curtain. Neither is there any explanation of his failure to lean down sufficiently to look out through the curtain at an angle that would enable him to see down the track. And he testifies affirmatively that he did not stop. It seems to be assumed that the driver was justified in sitting erect behind the wheel and in accepting the disadvantages of his observation post in this position as inevitable and insurmountable — although it does not appear that they were in fact so; and that, to the extent that difficulties of making perfect observations were present, the driver was relieved from effort to survey the danger of his situation. See Rintala v. Duluth, W. P.R. Co. 159 Minn. 499, 561, 199 N.W. 564.
It is also suggested that the steepness of the grade, the turn in the road and the roughness of the crossing combined as distracting elements, absorbing the attention of the driver to a point where it would not be reasonable to require him to exercise that degree of caution which would be exacted under normal conditions. We are of the opinion that these circumstances either alone or in combination with all other attendant circumstances, do not indicate a degree of distraction that would relieve the driver from the exercise of ordinary caution in approaching the crossing in question. See Sherlock v. Minneapolis, St. P. . S. Ste. M.R. Co. 24 N.D. 40; 138 N.W. 976; Spencer v. New York C. 
H.R.R. Co. 123 App. Div. 789, 108 N.Y. Supp. 245. Certainly one *Page 410 
whose general course is parallel with the railroad and who must turn at right angles to make a crossing is not relieved from the duty of looking to ascertain the approach of a train, even though observation might involve some effort. Amenia S. Land Co. v. Minneapolis, St. P. S. Ste. M.R. Co. supra; Yanaway v. Chicago, R.I. P.R. Co. 195 Iowa, 86, 190 N.W. 21.
There is nothing in this record to show that the incline was unusually steep for a grade crossing, nor that the crossing was unusually rough. In fact the pictures clearly indicate that it was not so, and in eliciting the testimony, with reference to the roughness of the crossing, the examiner does not particularize but leaves the subject exhausted when the witness, testifying to the presence of planks, uses the adjective "rough" as descriptive. The use plaintiff, Byfield, testified that, in approaching the crossing, he had no occasion to use the brake levers; that in shifting gears it was not necessary for him to stop, nor to take his eyes off the road, nor to look at the steering wheel in order to steer the car. Assuming, without deciding, that the presence of unusual and distracting circumstances might serve to excuse the driver from that degree of caution which might otherwise be required (Spencer v. New York C. H.R.R. Co. supra), we are clearly of the opinion that no such circumstances were shown here. It is not unusual to be required to make a turn on approaching a crossing. Neither is it unusual to be required to shift gears in moving a loaded truck over a grade crossing; nor are either of these operations ordinarily attended with a degree of difficulty sufficient to absorb the attention of the driver. So far as the roughness of the crossing is concerned, it would be highly speculative to say, under the evidence in question, that it operated in any degree as a distracting element. It is universal experience that railroad crossings are not as smooth as the ordinary road. A truck going at approximately 3 miles an hour would not cause a violent or unusual jar in going over a rather rough crossing.
We are of the opinion that, under the evidence in the instant case, there is no reasonable basis for any holding that the driver was exercising reasonable care and caution for his own safety at the time of the accident in question. We have examined many authorities and in no jurisdiction where contributory negligence defeats recovery do we find a case where a recovery has been supported under the facts comparable *Page 411 
to those in the instant case. See West v. Northern P.R. Co.13 N.D. 221, 100 N.W. 254; Sherlock v. Minneapolis, St. P. S. Ste. M. Ry. Co. 24 N.D. 40, 138 N.W. 976; Haugo v. Great Northern R. Co. 27 N.D. 268, 145 N.W. 1053; Christopherson v. Minneapolis, St. P. S. Ste. M.R. Co. 28 N.D. 128, L.R.A. 1915A, 761, 147 N.W. 791, Ann. Cas. 1916E, 683; Crowson v. Minneapolis, St. P. S. Ste. M.R. Co. 36 N.D. 100, 161 N.W. 725; Yanaway v. Chicago, R.I. P.R. Co. supra; Albright v. Chicago, R.I. P.R. Co. 200 Iowa, 678, 205 N.W. 462; Butler v. Rockland, T. C. Street R. 99 Me. 149, 105 Am. St. Rep. 267, 58 A. 775; McNab v. United R. 
Electric Co. 94 Md. 719, 51 A. 421, 11 Am. Neg. Rep. 240; Lanier v. Minneapolis, St. P. S. Ste. M.R. Co. 209 Mich. 302, 176 N.W. 410; Shoemaker v. Central R. Co. ___ N.J.L. ___, 89 A. 517; Plinkiewisch v. Portland R. Light P. Co. 58 Or. 499, 115 P. 151, 2 N.C.C.A. 746; Virginia S.W.R. Co. v. Skinner,119 Va. 843, 89 S.E. 887.
Counsel argue that a recovery may be supported in this case under the humane doctrine of the last clear chance. A careful analysis of the argument might justify a critical examination of the doctrine invoked for the purpose of determining to what extent, if at all, it represents a modification of the law with respect to contributory negligence and proximate cause. See §§ 27 and 54, Beach on Contributory Negligence. But we are of the opinion that the doctrine in its broadest application will not support a recovery in the instant case. Those engaged in the operation of railway trains are not bound to anticipate that drivers of automobiles and trucks upon the highways will be guilty of negligence in approaching crossings without taking reasonable measures to ascertain the approach of a train. If the rule were otherwise, the last clear chance doctrine would require the trainmen, at the peril of being held responsible for an accident, to slow down every time they should observe an oncoming motorist in a position where, if he did not see the train, he might negligently collide with it. The authorities sustain the view that one is not in a position of peril within the last clear chance doctrine when he occupies a place where, by the exercise of reasonable care for his own safety, all danger may be avoided. See Green v. Los Angeles Terminal R. Co. 143 Cal. 31, 101 Am. St. Rep. 68, 76 P. 719; Wallis v. Southern P. Co. 184 Cal. 662, 15 A.L.R. 117, 195 P. 408; Gumm v. Kansas City Belt R. Co. 141 Mo. App. 306, *Page 412 
125 S.W. 796; Laughlin v. St. Louis S.F.R. Co. 144 Mo. App. 185, 129 S.W. 1006; Virginia S.W.R. Co. v. Skinner, supra; Butler v. Rockland, T. C. Street R. Co. 99 Me. 149, 105 Am. St. Rep. 267, 58 A. 775; Plinkiewisch v. Portland R. Light P. Co. 58 Or. 499, 115 P. 151, 2 N.C.C.A. 746. In such a case the chain of causation extending from the original negligence is broken by the independent subsequent negligent act of the plaintiff and the original negligence is not the proximate cause of the injury. It can not be contended in this case that the defendant was negligent after the driver's negligence had exposed him to peril. It was then too late to avoid the collision. See Virginia 
S.W.R. Co. v. Skinner, supra.
The judgment appealed from is reversed and the cause remanded to the district court with directions to enter a judgment of dismissal.
CHRISTIANSON, Ch. J., and BURKE, JOHNSON, and NUESSLE, JJ., concur.
 On petition for rehearing.