AMENIA & SHARON LAND COMPANY, a corporation, Respondent, v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY, a corporation, Appellant.

(189 N. W. 343)

**Negligence — automobile driver held negligent; automobile driver's negligence not imputable to occupants; negligence of railroad in approaching crossing held for jury.**

Five actions were brought and tried together to recover damages against defendant railroad company for alleged negligence resulting in a collision upon a crossing, know as McCarty's crossing, four miles south of Detroit, Minnesota. Those injured in the collision were riding in a

one-seated Buick roadster. As it was going over the crossing it was struck by an engine pulling a freight train. It is *held*:

1. For reasons stated in the opinions, the judgments in favor of the driver of the car and of the owner who entrusted it to his care, should be reversed.

2. For reasons stated, the judgments as to the remaining plaintiffs, who were passengers in the car, are affirmed.

Opinion filed June 9, 1922.   Rehearing denied July 18, 1922

Appeals from judgments of the District court of Cass county; *Cole,* J.

Reversed as to plaintiffs A. E. Cure and Amenia & Sharon Land Company; affirmed as to remaining plaintiffs.

*Young, Conmy & Young,* for appellant.

Outside of the limits of cities, villages, and towns, no rate of speed of a railroad train, however great, is evidence of negligence. Railroad Co. v. Grablin, 38 Neb. 90, 56 N. W. 796 and 57 N. W. 552; Railroad Co. v. Hansen (Neb.), 66 N. W. 1105.

But the failure of a railroad company to ring a bell or sound a whistle when approaching a crossing is simply evidence which tends to prove negligence on the part of the railroad company. It does not necessarily demand an inference of negligence. Railroad Co. v. Metcalf, 44 Neb. 848, 63 N. W. 51.

"This court had already held that running a passenger train at a rate of speed shown by the record to have been the speed being made by the train in this case, not within any city limits, was not negligence." Omaha & R. V. R. Co. v. Talbot, 48 Neb. 627, 67 N. W. 599; Jordan v. Osborne, et al., 133 N. W. 32; Liverett v. Nashville C. & K. Ry. 65 So. 55.

"It is for the legislature, not for the courts, to say that the defendant shall change its train schedule, and this is what holding the defendant negligent on the ground of excessive speed would amount to."   145 N. W. 1088; State v. Philadelphia B. & W. R. Co., 87 Atl. 496 (Md.)

Where the speed of the train is great, care in giving warning of the approach of the train commensurate with the danger must be observed. Railroad Co. v. Goetz's Adm'x. 79 Ky. 442, 42 Am. Rep. 227; Parkerson v. L. & N. R. Co., 80 S. W. 468.

This being in effect a country crossing, the statute applies." Louisville & N. R. Co. v. Molloy's Adm'x. 91 S. W. 687.

"When the company and its agents conform to such legislative directions they are within the protection of the law." New York L. E. & W. R. Co. v. Leaman, 23 Atl. 692-3.

"Where the whistle on an engine is sounded when the train is from a quarter to half a mile from a country grade crossing, so that it can be heard there, and the track can be seen for a distance of about 400 feet at a point 800 feet from the crossing ,and 74 feet from the crossing it can be seen for 990 feet, it is not negligence to run a train at the rate of 50 miles an hour over such crossing." Newhard v. Pennsylvania R. Co. 26 Atl. 105 (Pa.)

"The duty of an automobile driver approaching a crossing with view of track obstructed is to look and listen before going on the track, and as soon as seeing and hearing are reasonably possible; to keep a lookout from there on such as an ordinarily cautions person would but for some sufficient diversion of his attention; to have his machine under such control that on discovering a train he, acting as a person of ordinary skill and prudence, can stop in time; to determine, acting as a person of ordinary care, on discovering a train, whether he can safely pass or should wait—all this, regardless of the train running at excessive speed and without signal." * * * "Driver of automobile struck at a dangerous crossing, with which he was familiar, by train approaching at excessive speed and without warning signal, held, guilty of contributory negligence, as a matter of law, in not observing after passing structures obstructing his view, or not having machine under control, or in taking chance of crossing ahead of train." Corbett v. Hines. Director General of Railroads, 180 N. W. 690.

The following cases deal specifically with about this situation and hold there was contributory negligence as a matter of law. Central R. R. v. Barnett (Ala.) 44 So. 392; Aurelius v. Ry. 49 N. E. 857; Schufelt v. Ry. Co. (Mich.), 55 N. W. 1013; Tucker v. Ry. Co. (Mich.), 80 N. W. 984; Jobe v. Memphis Ry. (Miss.), 15 So. 129; Kelsey v. Ry. Co. (Mo.), 30 S. W. 339; Cleveland Ry. Co. v. Elliott, 82 Ohio St. 340; Glum v. Harris, 37 Atl. 515; Dehoff v. Ry. Co., 78 Atl. 104; Schneider v. Ry. Co. (Wis.), 75 N. W. 169; B. & M. Ry. v. McGrath, 179 Fed. 323.

"Relative to contributory negligence, a passenger in an automobile struck by an engine at a crossing could not rely on the driver, but had to look for approaching of the engine." Kirby v. Kansas City, K. V. & W. Ry. Co. (Kan.), 186 Pac. 746.

"Where a husband and wife, traveling together in a conveyance which

the former is driving, are injured in a collision on a railroad crossing, the court cannot properly instruct that, if the wife relied on her husband to look and listen and to exercise reasonable care, she was relieved from so doing herself, since she was bound to the same degree of care as her husband." Willfong v. Railway Co., 116 Iowa, 548, 90 N. W. 358.

"The rule that the driver's negligence may not be imputed to the plaintiff should have no application to this case. Such rule is only applicable to cases where the relation of master and servant or principal and agent does not exist, or where the passenger is seated away from the driver by an enclosure, and is without opportunity to discover danger and to inform the driver of it. It is no less the duty of the passenger, where he has the opportunity to do so; than of the driver, to learn of danger, and avoid it if practicable." Rebillard v. Minneapolis, St. P. & S. S. M. Ry. Co., 216 Fed. 505-6.

*Fowler, Green & Wattam*, for respondent.

Wigmore Ev. 664; 2 Elliot Ev. 969; Cinadar v. Detroit, G. H. & M. Co., 159 N. W., at p. 315 (Mich.); Kaufmann v. C. M. & St. P. Ry., Co., 159 N. W. 552 (Wis.); Zenner v. G. N. Ry. Co., 159 N. W. 1087 (Minn.); Cotton v. Ry. Co., 109 N. W. 835 (Minn.)

"Statutory precautions imposed upon railway companies for the protection of travelers at crossings do not furnish the only standard of care or caution, but are cumulative merely, and do not exclude a liability on the part of the railway company for failing to take such other and further precautions as may be reasonably necessary under all the surrounding circumstances." Thompson on Negligence, Vol. 2, § 1555.

"The statutory provisions of the state regulating the ringing of the bell and blowing of the whistle on approaching a public crossing are not the sole measure of the duty of a railroad company to protect persons and property at public crossing. Nor do regulations embodied in ordinances passed by city councils under statutory authority, regulating the speed of trains and the giving of signals at public crossings within city limits, constitute the sole criteria of the care to be used by such corporations in the management of their trains. The common law obligation resting upon such corporations to use proper care in the operation of their trains to protect persons and property is not diminished by such statutory provisions or ordinances." Coulter v. G. N. Ry. Co., 5 N. D. 568 (Quotation from syllabus); Wilson v. Ry. Co., 142 N. W. 59 (Iowa). See especially Yinyon v. C. & N. W. Ry. Co., 92 N. W. 40 (Iowa), and cases cited.

"Railroad men are not entitled to more credit, as a matter of law, because of their knowledge and experience as such on the question as to the speed at which a railroad train was run, in an action for damages for a personal injury by being run over by such a train, though the fact of their possessing such knowledge and experience might properly be considered by the jury in determining what weight should be given their testimony" Louisville & St. L. Consol. R. Co., v. Gobin, 52 Ill. App. 565.

"The rate of speed, though not regulated by law, may be considered with other facts tending to establish negligence." Artz v. Railroad Co., 44 Iowa 285.

While it is not necessarily negligent to run a train at the usual rate, or at 40 miles an hour, it is negligent to maintain the usual rate of speed without observing the usual precautions and danger signals to warn the public of its approach."

"While the general rule is that no rate of speed by a railroad train in the open country is negligence per se, it is not less true that a railroad company running its trains across streets and highways must operate them with due regard to the rights and safety of the public at points where these avenues of travel and commerce intersect * * * this duty is emphasized where the crossing is made in surroundings which obscure the view or are of such a character as to render the ordinary signals less noticeable or less effective." Wilson v. C. M. & St. P. Ry. Co., 142 N. W. 54 (Iowa).

"Travelers may, within reasonable limit, act upon the assumption that due care will be exercised in the management of trains and giving of crossing signals." Jenkins v. Minneapolis and St. L. R. Co., 145 N. W. 40 (Minn.)

"Automobilists approaching a crossing have a right, if the contrary does not appear, to assume that the railroad employees will give the customary warning and will not run at a speed in excess of that allowed by ordinance." Barrett v. C. M. & St. Ry., Co., 175 N. W. 950 (Iowa); Edwards v. G. N. Ry. Co., 42 N. D. 154; Wilson v. C. M. & St. P. Ry. Co., 142, N. W. 59 (Iowa); Pendroy v. G. N. Ry. Co., 17 N. D. 433. See also Stone v. N. P. Ry. Co., 29 N. D. 480; Hauff v. S. D. Central Ry. Co., 147 N. W. 986 (S. D.); Wallenburg v. Ry. Co., 126 N. W. 289 (Neb.); Green v. Ry. Co., 69 Pac. 694 (Calif.) See also Barrett v. Ry. Co., (Iowa) 175 N. W. 950.

ROBINSON, J. At a point about 4 miles south from Detroit, Minn., the Soo Railway crosses a highway; it is known as McCarty's crossing. There on a pleasant summer afternoon of June 22d, at 4 p. m., a freight railway train of 22 cars, going north at a speed of 25 miles an hour, collided with the rear end of a Forty-Five Buick roadster going east on the highway at a speed of 20 miles an hour—30 feet per second. The mobile was badly demolished. Mrs. Cure, a lady of 42 years, was killed, and each of her four children sustained injuries. Mr. Cure, the grandfather of the children, who had assumed the place of the father, was the driver of the Buick, and he escaped serious injury. The Buick had but one seat, sufficient for only two or three persons. Mr. Cure sat on the driver's side, which was the left end of the short seat. One girl sat on his right, holding a baby on her lap. On her right the mother sat, holding on her lap another child, and the boy of 11 years stood on the running board, holding onto the wind shield. They were out on a family picnic, and were going to Detroit for supplies. For a considerable distance before reaching the crossing the road was parallel to the railway track and at a distance of about 200 feet. Approaching the crossing the road made a gradual turn to the east. When the car was within 60 or 70 feet of the crossing it was seen by a brakeman. The boy was seen with a foot lifted as if about to jump from the car. The alarm was given. The engineer applied the emergency brakes. The boy called to his grandpa, and the collision was immediate. The parties injured assert that the negligence of the railway company was the direct and proximate cause of the accident. The company assert that the proximate cause was the negligence of the plaintiffs. Of course it is possible for an accident to happen without the fault or neglect of either party. But, certain it is, the railway train had the right of way. It did not have to stop, or even slow up, at a country road crossing. It was under obligations to blow the whistle at a whistling post set a quarter of a mile from the crossing. It is certain the whistle was duly blown. The engineer testifies that at the post he did sound the whistle two longs and two shorts, and he pushed the button which set in motion a continuous ringing of the automatic bell. His testimony is well corroborated by two brakemen. The whistling and the ringing was in accordance with duty and confirmed habit. The affirmative testimony in support of it far outweighs the negative testimony against it. Trainmen are anxious to save life and to avoid accidents. That is shown by the heroic conduct of the engineer, Mr.

Haygarth, who risked his life in rushing forward and catching the little girl, who was hanging onto the pilot beam, and hanging onto her till the train stopped. In all probability there was not one of the train crew who would not have risked his own life to save any of the children. Though in the railway service, "a man's a man for a' that."

And now for the negligence of the plaintiffs, Mr. Cure was an expert driver and speeder. He had in hand a new Buick Forty-Five roadster. He knew well how to use it. He went onto the crossing at a speed of 20 miles an hour, 30 feet per second. In one-fourth of a second more of leeway he would have made the crossing, and made Detroit before the freight train. As it was, the engine barely struck the hind end of the car, which was laden with six persons. The car was made for only two persons. By reason of the fact that Mr. Cure was cramped, the action to his hands his feet, and his mind were impeded. So the chances are that he lost a quarter of a second. The boy on the running board saw the fast approaching train in time to jump off, but he concluded that his fast speeding car would make the crossing, and of course there was danger in jumping off. The plaintiffs were guilty of negligence in piling into and overcrowding the car and thereby hampering the driver and obstructing his vision and hearing. They were negligent in not bringing the car to a full stop or looking both ways before crossing the track. By law when two trains approach a railway crossing each train must stop so that one cannot run into the other. But no railway train is required to stop or even slow up at country highway crossings. Before attempting to cross a railway track it is the duty of every pedestrian and every person to stop or look out for the cars. If he fails he is guilty of negligence, and must suffer the consequences. In cases of this kind and in thousands of other cases the children may suffer, and must suffer, from the neglect of those who control them. The owners of the roadster must suffer from the negligence of the person to whom they intrusted their car.

And now for the verdict, so far as material:

Q. 5. Did defendant, in view of all the circumstances and surrounding facts, exercise due and reasonable care as far as blowing the whistle? A. No.

Q. 6. Did defendant exercise reasonable care so far as ringing the bell is concerned? A. No.

Q. 7. Did defendant exercise due and reasonable care in speed of the train. A, No.

Q. 8. Was such failure the proximate cause of the accident? A. Yes.

Q. 12. Did Mr. Cure exercise reasonable and ordinary care and diligence in the manner in which and the speed at which he approached and drove onto the crossing? A. Yes.

Q. 14. What damages, not exceeding $7,500, have the children of Mary Cure sustained by reason of the death of the mother? A. $7,500.

The verdict is clearly the result of sympathy, pity, and commiseration and of little regard for the rights of the big corporation. It is not sustained by the evidence. It is clear the engineer did blow the whistle and ring the bell, and there was no lack of care in speeding the train. It is also clear that the proximate cause, the direct cause, of the injury was the failure of the plaintiffs to stop and listen and look both ways before driving onto the railway track. There was manifest negligence in speeding the car up to and onto the track at the rate of 20 miles an hour. The speed was such that the boy who stood on the running board and saw the fast approaching train was afraid to jump off. He must have thought that the speed of his car would take him safely across, or that the speed was such that it would be more dangerous for him to jump off than to remain on the car. Had the roadster been driven at 10 or 12 miles an hour the boy would not have hesitated to jump off, and possibly Mr. Cure would not have hesitated to apply the brakes and stop his car. But going at a speed of 20 miles an hour there was more danger in trying to stop the car than in speeding across the track in front of the approaching train.

It was error for the court to submit to the jury question 7, concerning reasonable care in the speeding of the train.

It was error to submit question 5, concerning reasonable care in the blowing of the whistle. There was no real dispute concerning the whistling.

It was error to submit question 6, concerning reasonable care in the ringing of the bell. *The question should have been, Was the bell rung continuously;* and, if not, then did the failure to ring it cause the accident? When a locomotive is about to start and when it moves at a slow speed through towns, the bell ringing is a matter of great importance, because it can be distinctly heard. But when a locomotive pulls 22 freight cars, 25 miles an hour, the loud, heavy, and continuous noise of the locomotive and the cars drown the sound of a bell. When a railway freight train moves at the usual speed, it is commonly heard

at a distance of one-half a mile. It is heard by people in their homes, hotels and rooms, and beds, but the sound of a bell is never heard. The bell is heard only by those who are near to a slow moving train; hence it is certain that the accident was not caused by any failure to ring the bell. It was caused by recklessly running the Buick roadster onto the railway track in front of a fast moving train.

The above was written as the opinion of the court. Mr. Justice Christianson concurs by a special opinion. The other three judges hold in part to the contrary. Hence the decision of the court is that the judgment be reversed as to the car driver, A. E. Cure, and the owner of the car, Amenia & Sharon Land Company, and that as to the other three plaintiffs it is affirmed.

GRACE, J. (Dissenting in part and concurring in part). This is an appael from five judgments of the district court of Cass county, wherein a judgment was entered in each case in favor of the plaintiff and again the defendant. It is stipulated that the same evidence and exhibits may be considered as the record in all cases.

The cases grew out of a railroad crossing accident. The crossing is located a short distance south of Detroit, Minn., and is known as McCarty's crossing. The damages claimed is for compensation for injuries there received to persons or property. All the cases were consolidated for trial, and are likewise here consolidated and are briefed together. The basis of the action is negligence on the part of the defendant in failing to give proper signals while approaching and running their train over the above crossing. The defendant denied negligence, and alleged contributory negligence. As the accident occurred in Minnesota, the law of that state, with reference to giving of proper signals on approaching railroad crossings, is applicable and governs. The pleadings are largely similar in each case.

These are the material facts: On the 22d day of June, 1920, A. E. Cure, then resident of Amenia, Cass county, and his daughter-in-law, Mary E. Cure, and her four children, Harold, Madeline, Helen, and Clayton, whose respective ages, in the order named, are 11, 9, 7, and 2 years, were driving along a public highway, a short distance south of Detroit, Minn. The conveyance in which they were riding was an automobile, a Buick roadster; it was driven by A. E. Cure; it was owned by the Amenia-Sharon Land Company. Cure was then, and for 11 years had been, the superintendent of that company, and for 7 years prior

thereto was assistant superintendent. The car at that time had on it a winter top, with glass in sides of doors. The door on the right side was off, and the glass on the left-hand door was halfway down, and the wind shield was open. It had but one straight seat. Cure was driving, and sitting on the left side of the car; Helen Cure sat next to him, with Clayton on her lap; Mary Cure, the mother sat on the right side of the seat, with Madeline in her lap; Harold was standing on the right running board, holding onto the side of the wind shield.

The car was being driven northward toward Detroit; the highway, upon which it was being driven extended substantially parallel with the railroad until a point about 100 feet from the crossing was reached, where it turned eastward, and passed over the railroad tracks. On the railroad about 906 feet south of the crossing there was a cut through which the railroad extended. At its entrance it was about 7 feet in depth, increasing to about 15. Commencing at a point 20 feet from the crossing, and extending southward for a distance of 90 or 100 feet on the right of way, there were brush and trees which completely obscured the sight of the railroad from persons riding in an automobile along the highway at that point, except if the automobile were going very slow or were stopped, there were perhaps certain points where one could see through them. There was more or less brush and timber along the right of way from the north end of the cut to the crossing, except there was a space of about 250 feet where there was not much brush or trees, and the railroad track could be seen from the highway for that distance.

Kohler, a liveryman of Detroit, had driven over the McCarty crossing between 100 and 150 times a year. Three days after the accident he with Mr. Greene drove two different times, in an automobile, over the same road driven by Cure on the day of the accident; they started at the top of the hill on the road south of the crossing, and drove northward until they had driven over the crossing. He testified, in substance, that until the bottom of the hill was reached, nothing could be seen; then for 250 feet the track cou'd be seen, and the rest of the way was all brush until the crossing was reached. He testified that for 90 or 100 feet from the crossing there extended heavy brush and trees, which commenced about 20 feet from the crossing; that while driving along there he could not see through the heavy brush and timber, and that, at that place, a train could not be seen while approaching from the south; that he would be practically on the track before he could see the train, or within 10 or 12 feet of it.

Prior to the time of the accident, Cure had made two or three trips over the crossing; he knew the crossing was there, but did not know all the conditions surrounding it; the highway was not very good; he was traveling on it northward towards the crossing, and at a point on the highway about 200 feet south of the crossing he looked southward, but saw no train. At this point he could see the mouth of the cut; he looked again at 75 feet from the crossing, but he could not see through the brush; he was traveling then at the rate of about 15 or 20 miles per hour; when he turned eastward to go over the track, he was traveling at the rate of 10 to 15 miles per hour; he never shut off the engine, and did not hear any bell or whistle. As he drove along he was listening. After he had looked at the point 75 feet from the crossing where he could not see southward on acount of the brush and trees, he then looked northward. In that direction, there was a hill which commenced within 50. feet, or little in excess thereof, from the crossing. The cut through this hill was 12 or 14 feet deep. A train from the north could not be seen by a driver until he was 25 or 30 feet from the railroad track. .

Harold Cure, who was riding on the running board, as they approached the crossing looked southward, then northward, and then southward, and discovered the freight train, which was right on them and called to Cure and told him, "There is the train." When about 200 feet from the crossing, Mary Cure looked to see if the train was coming.

The testimony of Haygarth, the engineer, Blackburn, the fireman, and Erickson, one of the brakemen, is to the effect that the engine sounded the usual crossing whistle of two long and two short blasts at the whistling post. The testimony of the engineer and this brakeman shows that just after the whistle was sounded the automatic bell ringer was turned on. None of the brakemen were riding in the cupola of the caboose. The head brakeman was sitting beside the fireman. The testimony of Mrs. Spike, Mrs. Mary Sigsmith, Mrs. George Diamond, and Miss Thomas, witnesses for defendant, show that the whistle was blown at the whistling post; three of them testified that they heard the whistle for Griffith's crossing, which is a mile south of McCarty's crossing; they had been picking strawberries in the vicinity of the latter crossing, and that at the time when they heard the whistle of the engine for the whistling post they were a short distance east of the crossing. Mrs. Baunell and Miss Emily Diamond, plaintiff's witnesses, were also picking strawberries in the same vicinity, and at the time the car went by were sitting on a log, which was about 180 feet west and between

1,500 and 1,600 feet south of the crossing. Very soon after the automobile went by, they heard the whistle sounded. The four ladies above mentioned, who were defendant's witnesses, gave no testimony that they heard the bell ring, and none that they heard any whistle sounded other than as above stated. The ladies who testified for plaintiff said, in effect, that they did not hear any other whistle of the engine than that to which they testified, and that they did not hear the bell ring.

Immediately after Harold had called to Cure, the automobile went onto the railroad track, and was struck by the engine and train. Mary Cure was killed; Madeline and Helen and A. E. Cure, their grandfather, were injured; Harold escaped uninjured; the automobile was badly damaged.

The injured were taken to the hospital at Detroit; Dr. Larson of that city attended them professionally. He found that Mr. Cure had a gash about seven inches in length, extending backward and over the right side of his head; that the skin was opened so that the skull could be seen; he had bruises about his face, chest, and shoulder; he complained of pain in his legs; he had some skin bruises; one hand was bruised and the skin torn; he was in the hospital from the 22d of June until the 13th of July; he complained of pain constantly while in the hospital and of pain when he left, about the shoulders and neck. Madeline had a cut about two or three inches long over the right eyebrow, extending to the bone. She had swelling with a slight bruise on the scalp on the back part of the skull; she was unconscious for about a week. The second week she had periods of stupor; would scream on being disturbed; she had slight bruises on one limb; she suffered pain; she was in the hospital the same length of time as her grandfather. When she left the hospital she was able to sit up and walk around a little; her mental condition was fairly good. Helen had a gash on the back of her skull and on top, and a broken right collar bone; some bruises on the back and legs, and was unconscious the first two or three days; she had trouble with her abdomen, and the first night passed some blood from her bowels; she passed no blood after the first night, indicating no serious internal injury. She suffered very much pain and continued to so suffer for about 10 days; she was in the hospital the same length of time as her grandfather and Madeline. Her condition was fairly good when she left the hospital; she complained of pain in walking, which Dr. Larson testified was evidently due to the bruises in her hip and possibly her knee; and that when she walked she limped.

Their hosiptal, special nurse, and physician's bills aggregated $635.60, and were paid by A. E. Cure; the cost of repairing the automobile was $1,090.50. There is also testimony in the record that the difference between the value of the automobile at the time of the accident and a new one of that kind was about $1,200.

Stanley Cure was the husband of Mary Cure, and had deserted her in July, 1919. His father testified that he did not know where he was, and had not seen or heard of him since that time, though he had made efforts to trace and find him.

The pleadings in the cases are largely similar. They are of that character usual in actions of negligence. The complaint, in addition to the allegations, with reference to negligence, sets forth § 8175 of the General Statutes of Minnesota for the year 1913, which in substance provides that, where a death is caused by the wrongful act or omission of any person or corporation, the personal representative of the deceased may maintain an action if the deceased might have maintained one, if he were living, for an injury caused from the same act or omission. Plaintiffs also pleaded § 5001, Rev. Laws of the state of Minnesota for the year 1905, which, in substance, provides for the sounding of the whistle and the ringing of the bell upon locomotives at the distance of 80 rods from railroad crossings, and for the continuation thereof at intervals until the locomotive and train attached have completely passed over the crossing.

The answer, in addition to a general denial and certain admission of matters stated in the complaint, not necessary to mention, alleged that A. E. Cure and Mary Cure were engaged in a common enterprise, in operating and directing the operation of the automoblie. It is further alleged that the collision resulting in death of Mary Cure and other injuries and damages was caused by the negligence of A. E. Cure, and contributory negligence of Mary Cure.

The cases were tried to the court and a jury, and at the conclusion of them, defendant demanded a special verdict in each case. The court in compliance prepared such special verdicts.

The special verdicts in the cases of Dakota Trust Company and of A. E. Cure follow. It is unnecessary to set out the others, as they are very similar in form.

Question 1: Is the plaintiff a corporation duly organized and existing under and by virtue of the laws of the state of North Dakota, with its principal place of business at Fargo, N. D., and duly authorized

by the laws of the state of North Dakota to act as administrator of the estate of deceased persons; and was said plaintiff, on the 11th day of September, 1920, duly appointed and qualified, and ever since said date has it been the duly appointed, qualified, and acting administrator of the estate of Mary Cure, deceased? Answer: Yes.

Question 2: Was the defendant, on the 22d day of June, 1920, a corporation organized and existing under and by virtue of the laws of the state of North Dakota, and was it at said date engaged in the operation of a commercial railroad within the state of Minnesota, near the city of Detroit, carrying passengers and freight thereon for hire? Answer: Yes.

Question 3: Did the General Statutes of Minnesota, on the 22d day of June, 1920, provide as follows: "When death is caused by the wrongful act or omission of any person or corporation, the personal representative of the deceased may maintain an action therefor, if he might have maintained an action if he lived for an injury caused by the same act or omission. The action may be commenced within two years after the act or omission. The damages therein cannot exceed $7,500 and shall be for the exclusive benefit of the surviving spouse and the next of kin to be distributed to them in the same proportion as personal property of persons dying intestate, but funeral expenses and any demand for the support of the decedent to be allowed by the probate court shall first be deducted and paid?" Answer: Yes.

Question 4: Was Mary Cure, on the 22d day of June, 1920, while riding in an automobile across a public crossing on the railway of defendant near Detroit, Minn., struck by a train of said defendant and killed by reason of being so struck? Answer: Yes.

Question 5: Did the defendant railway company, in view of all the surrounding facts and circumstances, exercise due and reasonable care so far as the blowing of the whistle is concerned as the train approached and passed over the crossing? Answer: No.

Question 6: Did the defendant railway company, in view of all the surrounding facts and circumstances, exercise due and reasonable care so far as the ringing of the bell is concerned as the train approached and passed over the crossing? Answer: No.

Question 7: Did the defendant railway company, in view of all the surrounding facts and circumstances, exercise due and reasonable care so far as the speed of the train is concerned as it approached and passed over the crossing? Answer: No.

Question 8: If you answer either question 5, 6, or 7 No, then was

such failure to use due and reasonable care on the part of the defendant railway company the proximate cause of the accident? Answer: Yes.

Question 9: Were the deceased and one A. E. Cure engaged in a common enterprise at the time and place of the accident aforesaid? Answer: No.

Question 10: Did Mary Cure exercise reasonable and ordinary care and diligence as the automobile approached and passed up and onto the crossing? Answer: Yes.

Question 11: If you answered the last question Yes, then this question need not be answered; but, if you answeerd the last question No, then did such want of ordinary care on the part of Mary Cure contribute to cause the accident? Answer: ———.

Question 12: Did A. E. Cure exercise reasonable and ordinary care and diligence in the manner in which and the speed at which he approached said crossing and drove the automobile up and onto said crossing? Answer: Yes.

Question 13: If you answered the last question Yes, then this question need not be answered; but if you answered the last question No, then was such want of ordinary care on the part of A. E. Cure the proximate cause of the accident? Answer: ———.

Question 14: What amount of damages, if any, not exceeding $7,500, have the children of said deceased, namely, Harold, Madeline, Helen, and Clayton Cure sustained by reason of the death of their mother, Mary Cure? Answer: $7,500.

Dated March 23, 1921.

Wm. J. Doyle, Foreman.

The special verdict in the case of A. E. Cure is as follows:

Question 1: Was the defendant, on the 22d day of June, 1920, a corporation organized and existing under and by virtue of the laws of the state of Norh Dakota, and was it at said date engaged in the operation of a commercial railroad within the state of Minnesota near the city of Detroit, carrying passengers and freight thereon for hire? Answer: Yes.

Question 2: Was the plaintiff on the 22d day of June, 1920, while riding in an automobile across a public crossing over the tracks of defendant near Detroit, Minn., injured by being struck by a train of said defendant? Answer: Yes.

Question 3: Did the defendant railway company, in view of all the surrounding facts and circumstances, exercise due and reasonable care so far as the blowing of the whistle is concerned as the train approached and passed over the crossing?   Answer: No.

Question 4: Did the defendant railway company, in view of all the surrounding facts and circumstances, exercise due and reasonable care so far as the ringing of the bell is concerned as the train approached and passed over the crossing?   Answer: No.

Question 5: Did the defendant railway company, in view of all the surrounding facts and circumstances, exercise due and reasonable care so far as the speed of the train is concerned as it approached and passed over the crossing?   Answer: No.

Question 6: If you answered either question 3, 4, or 5 No, then was such failure to use due and reasonable care on the part of the defendant railway company, the proximate cause of the accident?   Answer Yes.

Question 7: Did the plaintiff A. E. Cure exercise due and reasonable care and diligence in the manner in which and the speed at which he approached said crossing and drove the automobile up and onto said crossing?   Answer: Yes.

Question 8: What damages, if any, not exceeding $2,900 has the plaintiff A. E. Cure sustained by reason of the injuries received in the collision on June 22, 1920?   Answer: $1,200.

Dated March 23, 1921.

Wm. J. Doyle, Foreman.

The defendant submitted to the court additional questions in each case, which it requested to be incorporated into the special verdict, which the court refused to do. These questions were the same in the Dakota Trust Company case, and in that of Helen and Madeline, and are as follows:

(1)   Was the engine whistle blown for this crossing at least 80 rods away from it?

(2)   Was the bell rung on the engine at intervals or constantly as it approached and passed over the crossing?

(3)   If Mary Cure had diligently looked could she have seen the approaching train in time to have the automobile stopped before it got on the track?

(4)   If Mary Cure had listened could she have heard the approaching train in time to have the automobile stopped before it got on the track?

(5)   Would an ordinary prudent person situated as was Mary Cure have requested the driver of the automobile to go slower as the car approached and went over the railroad crossing?

(6)   Would an ordinary prudent person situated as was Mary Cure have requested the driver of the automobile to stop and look as the car approached and went over the railroad crossing?

(7)   Was the driver of the automobile guilty of any lack of care in the manner or in the speed at which he approached the crossing?

(8)   If you answer question No. 7 Yes, was this lack of care the proximate cause of the accident?

(9)   Was the collision at the crossing between the automobile and the train an accident for which no one in particular was to blame?

(10)   Was the whistle blown at intervals as the engine approached and passed over the crossing?

In the case of A. E. Cure and the Amenia-Sharon Land Co., the additional questions submitted are substantially the same and are as follows:

(1)   Could A. E. Cure have seen the approaching train in time to stop his car if he had diligently used his eyesight?

(2)   Could A. E. Cure have heard the approaching train in time to have stopped his car if he had diligently used his sense of hearing?

(3)   Was A. E. Cure in the exercise of ordinary care in the manner. in which and the speed at which he drove his car up and onto the crossing?

(4)   At what speed did the automobile approach the crossing?

(5)   At what speed did the automobile go over the crossing?

(6)   Could A. E. Cure have seen or heard the train in time to stop and avoid the accident if he had reduced the speed of the car?

(7)   Could A. E. Cure have seen or heard the train in time to stop and avoid the accident if he had reduced the speed of the car and lessened the noise made by the car as it traveled along?

(8)   Was the engine whistle blown for this crossing at least 80 rods away from it?

(9)   Was the bell rung on the engine at intervals or constantly as it approached and passed over the crossing?

(10)   Was the collision at the crossing between the automobile and the train an accident for which no one in particular was to blame?

(11)   Was the whistle blown at intervals as the engine approached and passed over the crossing?

There being five cases consolidated for trial and the proceedings at

the trial, including the attention of the attorneys having been directed for a time to one of the cases, then to another and then another, back and forth as occasion might require, the oscillation of the instructions back and forth among the different cases renders it difficult to give an intelligent analysis of the errors complained of, of which the defendant has assigned more than 100. To attempt to discuss them would lead to an opinion in length which, when printed, would perhaps occupy one-half the space of an ordinary law report. Most of them are without merit, and but few need any extended discussion. A few assignments of error dealing with what may be claimed as the cardinal errors arranged in systematic order and properly argued can easily be imagined to be of great service to the court in affording it an opportunity to intelligently comprehend error, if there be such, in the trial of the case; but endless assignments, many of which are trivial, or which, on the merest inspection, appear to have no semblance of merit, should not be returned as a part of the record here, as such practice serves only to confuse the court, and prevent an intelligent analysis of such errors as may have a semblance of real merit.

The real object of the trials was to ascertain whether the defendant was negligent in the operation and conduct of its train at the time and place under consideration, and whether that negligence was the proximate cause of the injuries which ensued, and the damages suffered thereby. There are other questions, it is true, such as the contributory negligence, if any, of A. E. Cure, the imputation of his negligence, if any, to Mary Cure, and still others of like importance; and to properly present these and the larger questions in the trials below, and here on appeal, is the manifest duty of all parties. The administration of justice is at all times sufficiently difficult, but that difficulty is enhanced and confusion increased where many matters of no material consequence are made the basis of error, and which in reality are wholly insufficient to support a decision if such were the basis of it. Perhaps between 30 and 40 of the errors assigned relate to the alleged erroneous, or admission or exclusion of, evidence; some relate to refusal of . the court to direct verdicts in defendant's favor, and others to the insufficiency of the evidence to sustain the verdicts. . A large number relate to alleged errors in the charge of the court or in the refusal to give certain instructions requested by the defendant; others to the contention that A. E. Cure was negligent and that his negligence was the proximate cause of the injuries; others that Cure's negligence was imputed to Mary Cure; and still others

based upon the contention and there was no showing of negligence of defendant proximately causing the injury.

We have considered all of the assignments of error, but discussion here will relate and be confined to those which have been argued. We will consider the assignments in the order above mentioned.

Under the eighth assignment of error, certain questions were asked one of the plaintiff's witnesses, relative to the speed of the train; the witness did not testify to the speed of the train in miles, either actually or approximately, but stated that it appeared to be going very fast. Timely objection was interposed to this evidence, which was promptly overruled by the court, and a motion to strike it from the record denied. In view of the whole of the evidence as to the speed of the train, and of the entire situation and attendant circumstances, just prior to the time of the occurrence of the injury, we are not prepared to say that the defendant was prejudiced by the admission of such evidence. It is true that the engineer, fireman, and one of the brakeman testified that the speed of the train at that time was about 25 miles per hour. The jury, however, are not bound entirely by that evidence. Their evidence does not show that they were doing otherwise than estimating the speed of the train. True it is, they were experienced in the operation of trains, and this was a circumstance which the jury could take into consideration, but because they were railway employes does not necessarily as a matter of law entitle their testimony to greater credit than that of other competent witnesses. To say that the train is going very fast is a relative expression. It does not necessarily mean that a train was going 50 or 60 miles per hour. Such an expression is not altogether incongruous to an express statement that the speed was 25 miles per hour; and, further, we think this evidence, in the circumstances of this case, would not be wholly valueless because it did not fix the speed in miles per hours.

Cure looked back when he was within 200 feet of the crossing, which is 906 feet from the cut; he saw no train and heard no whistle nor bell; his car was new, it is fully described in the evidence. It would seem that, if the train was at all near at the time Cure was 200 feet from the crossing, he would have noticed or heard it, yet at the speed he traveled from there to the crossing, which could not have consumed but a short space of time, he was met at the crossing by the train, so that the train must have been traveling at quite rapid speed to travel the distance it must have traveled from the time Cure looked for it, and neither saw nor heard it, until about the time of the collision. We do not think the

admission of Cure's evidence in this respect in any event forms the basis of prejudicial error. It had some probative force, and we do not think it was improper to permit such testimony to be considered by the jury, together with all other evidence relative to the speed of the train. However, if the speed of the train was no more than 25 miles per hour, in the condition surrounding this crossing, the obstruction of the view of it from either discretion—which we will more fully describe in discussing defendant's negligence—it cannot be said as a matter of law that, that rate of speed was not negligent.

The accident occurred at 4:45 in the afternoon. It was brought out, on cross-examination, from one of defendant's witnesses, that a passenger train following this freight was due in Detroit at 5:21. The evidence shows that the freight which caused the injury was behind time. Such testimony in some degree, however slight, might have some tendency to show that the speed of the train was quite rapid. We do not think that it was reversible error to exclude defendant's offer to prove that, under the rules of the company, a freight train was only required to be in the clear five minutes before the passenger was due to arrive at the passing point. Assuming that is the record of the company, no freight crew can absolutely tell whether they can reach the point of passing, so as to have those five minutes, for many things might occur to delay their arrival at the point of passing. These are matters which they perhaps take into consideration, and if everything were working well, they would perhaps make as good speed as they could during that time so as to allow for any loss of time which might be necessitated by the happening of events which they could not anticipate.

We cannot take space to discuss other alleged errors in the admission or exclusion of evidence. We are satisfied there was no prejudicial reversible error in this respect.

The contention of defendant that the court erred in its refusal to direct verdicts in favor of the defendant needs no discussion. The court could not say, as a matter of law, that there was not substantial evidence tending to establish defendant's negligence.

It is now proper to consider the alleged errors in the court's charge. The defendant contends that, though the cases were submitted for special verdict, the court charged the jury as though the case was being submitted for general verdicts, and that it told the jury in detail what the result of their findings would mean, and, further, that it repeatedly referred to negligence and contributory negligence, while neither is men-

tioned in the special verdicts. It is clear that the charge is not general in its nature, but was well within the rule laid down in the case of Nygaard v. Northern Pacific Ry. Co. (N. D.) 178 N. W. 961. The defendant's contention that the words "negligence" and "contributory negligence" were· not used in the special verdicts is without merit. The slightest examination of the questions shows that they include both of those terms. Those exact words were not used, but expressions which included their substance were. In our opinion the court's instructions did not tell the jury what the result of the findings would mean, and the objection to them in that respect is without merit.

The following part of the charge is complained of and assigned as error:

"In determining your answer to question 10 in the case of the Dakota Trust Company I charge you that with reference to the deceased, Mary Cure, there is no evidence in this case that she was engaged in operating the automobile in question with A. E. Cure as a joint adventure or enterprise, and that her situation was that of a passenger and guest merely. The care required of her was the care which would be exercised by an ordinarily prudent person riding as a passenger under such circumstances. A passenger in a vehicle is not held to the same degree of watchfulness as the driver. The primary duty of caring for the safety of the vehicle and passengers rests upon the driver, and, unless the danger is obvious or is known to the passenger, the latter may rely upon the assumption that the driver will exercise proper care and caution in approaching a place of danger, unless he or she knows the driver to be incompetent or has reason to believe that he is not performing his duty by looking for trains, and such facts are proven by the evidence. A passenger is not necessarily guilty of contributory negligence if he or she fails to look and listen. The test is as to what a reasonably prudent person should have done under the circumstances, taking into consideration her knowledge of the skill and experience of the driver, and all the other surrounding facts and circumstances of the case. You may also take into consideration in determining your answer to this question whether or not if the deceased, Mary Cure, had attempted to look and listen for an approaching train with the view of herself helping to anticipate or discover any possible danger, and thereby, for the time being, exercised no control over the minor children in the car, she would or not have rather increased than diminished the danger by the possibility of diverting the attention of the driver, A. E. Cure, from the control and

operation of the car, and from his diligence and care in controlling and operating his automobile as he approached the railway crossing."

It is clear that A. E. and Mary Cure were not engaged in a joint adventure in the operation of the automobile. The former, and he alone, was operating it, and had full control over and charge of it; she was merely a passenger in the car, and was justified in relying on the presumption that the driver would use proper care and precaution in approaching a place of danger unless she knew or ought to have known otherwise. If there were evidence that he was an incompetent or a careless and indifferent driver, and she knew it, there might be some ground for defendant's contention, but there is no such showing. The evidence shows she exercised that degree of care which in the circumstances of this case an ordinary prudent person, riding as a passenger, would exercise. It was her duty, as a mother, to look after her children then in the car, and certainly she was not required to look and listen for the train, and she had a right to believe that the driver would use due care, and she was not required to do more than has already been stated to be her principal duty. We are clear that the instruction contains no prejudicial error.

The following part of the charge given in the A. E. Cure case is assigned as error:

"In the matter of speed embodied in question 5, I further charge you that with reference to the rate of speed at which a train travels, you are told that it cannot be said as a matter of law that any particular rate of speed is excessive. Ordinarily a railroad company has the right to operate its trains as fast as it desires to do so, but in operating them at a high rate of speed they are required to give such signals as will enable a person using the highway to avoid collision by the exercise of ordinary care, and if the character of the crossing is such that, when the signals given are considered, one attempting to use the crossing cannot do so safely by the use of ordinary care and avoid collision with a train coming at the speed adopted, then such speed for that point would be excessive."

And, further, the following part of the charge relating to question 4 in the A. E. Cure case cay be considered in connection with that just above mentioned:

"In this connection your attention has just been called to the statute of the state of Minnesota, which provides that an engineer on a locomotive shall ring the bell or sound the whistle on the locomotive, or cause the same to be rung or sounded, at least 80 rods from a road crossing

on the same level, and to continue the ringing as hereinbefore stated in reference to your answer to question 3; and, if you find that the engineer failed to comply with the statute in that respect, then that would be a fact and circumstance for you to consider so far as the ringing of the bell is concerned, along with all the other evidence in the case, in determining whether or not the defendant was guilty of negligence."

Also the following part of the charge relative to question 5:

"You will take into consideration in determining your answer to such question all of the testimony in connection therewith as to the speed, given on the part of both the plaintiff and defendant; the conditions of the railroad as to the view of an approaching train being possible and observable from the highway upon which plaintiff, Cure, was approaching, the distance at which a train could be seen from the railroad track from the different points of view as he approached; the matter of cuts; if there appear to have been any cuts; the condition of the weather and atmosphere; the possibility or probability of the whistle being heard at the distance at which it was to be blown by the requirement of the statute, and as to its being heard if blown afterwards, taking into consideration the physical surrounding such as the condition of the track being in the clear or obstructed, any timber or any other obstruction as to sound or sight, and all of the other facts and circumstances in connection therewith that have been testified to in the case, and from them determine whether or not, under all of the facts and circumstances as stated, the speed of the train, whatever that speed may have been, was an excessive speed in view of the conditions and surrounding circumstances of the line of approach of the plaintiff in his automobile, and if you find that in view of all the facts and circumstances, the speed was excessive at the time and place, and under the conditions existing, then your answer should be No; otherwise Yes."

We think there was no reversible error in the instructions above set forth; they were confined to certain questions, and in part instructed that any particular rate of speed could not be said, as a matter of law, to be excessive, but when trains are being operated at a high rate of speed, such signals are required to be given as will enable a person of ordinary care, using the highways, to avoid collision with them. The instructions in full are well confined to the particular questions of the special verdicts.

We think there is no real merit in defendant's contention that the negligence of A. E. Cure was the proximate cause of the injuries. In other words, that he was guilty of contributory negligence to such a de-

gree that the injury was caused by his and not defendant's negligence. Furthermore, it is well settled in this jurisdiction that the question of contributory negligence is one of fact for the jury, and not one of law for the court. Coulter v. G. N. Ry. Co., 5 N. D. 568, 67 N. W. 1046; Pendroy v. G. N. Ry. Co., 17 N. D. 433, 117 N. W. 531; Hollinshead v. Mpls. S. St. M. Ry. Co., 20 N. D. 642, 127 N. W. 993; Edwards v. G. N. Ry. Co., 42 N. D. 154, 171 N. W. 873.

The jury has specifically found that the defendant, in view of all the surrounding facts and circumstances, did not use due and reasonable care relating to the sounding of the whistle, the ringing of the bell and the speed at which the train was operated, as it approached and passed over the crossing. It further specifically found that A. E. Cure exercised reasonable and ordinary care and diligence in the manner in which, and the speed at which he approached the crossing and drove the automobile up and onto the crossing. It also further found that the defendant's failure to use such due and reasonable care was the proximate cause of the accident. The determination of the jury in this respect, we think, disposes of these questions, and its verdict should stand, where, as in these cases there is substantial evidence to support them.

It is proper at this point to advert briefly to the question of defendant's negligence. There is evidence that the whistle was sounded at the whistling post, and that immediately thereafter the automatic bell ringer was set. There is evidence on behalf of the plaintiffs to the effect that after the whistle was sounded to the south from where the witnesses then were, they did not hear the whistle again sounded, nor did they hear the bell ring. There is no testimony on behalf of defendant that the whistle sounded after the time at the whistling post. There is testimony on behalf of defendant that the bell ringer was set just after the whistle was sounded at the whistling post. A witness for the defendant testified:

Q. You, I believe, testified the bell was ringing. A. Yes, sir; the bell was ringing.

This witness had not testified as the question indicates, but had testified to the effect that the engineer had turned on the bell ringer, after he had sounded the whistle at the whistling post.

A witness for defendant was asked the following question:

Q. State whether or not the bell was ringing as the train passed over the crossing? A. The bell was ringing.

It was for the jury to say under all the evidence whether or not

defendant failed to use reasonable care relative to the giving of proper signals for the crossing.

Section 5001, Revised Laws of Minnesota of 1905, provides as follows:

"Every engineer, driving a locomotive on any railway, who shall fail to ring the bell or sound the whistle upon such locomotive, or cause the same to be rung or sounded, at least eighty rods from any place where such railway crosses a treveled road or street, on the same level (except in cities) or to continue the ringing of such bell or sounding of such whistle at intervals until such locomotive and the train thereto attached shall have completely crossed such road or street, shall be guilty of a misdemeanor."

It will thus be seen that it is not sufficient, under the provisions of that statute, to simply sound the whistle or ring the bell 80 rods from the crossing. It is manifestly the intent of that statute that where a crossing is dangerous, the whistle should be blown or the bell rung until the crossing is passed. The evidence in this case clearly shows that the crossing is dangerous. On one side of the crossing, within 50 feet of it, is a hill, though which there is a deep cut, where the railroad is situated; 906 feet in the opposite direction is another deep cut and a large hill; along the right of way on the side of the railway where the highway is situated and where 100 feet and to within 20 feet of the crossing are thick brush and trees; there is more or less brush all the way from the cut farthest away from the crossing with the exception of 250 feet. There is no competent evidence to show that the whistle was sounded after it left the whistling post, and unless the fact that there is evidence showing that the automatic bell ringer was set, and that presumptively the bell rang from that time onward until the crossing was passed, there is no evidence showing that the bell was rung. The testimony of the witnesses who were in the vicinity of the crossing that they did not hear the whistle blown nor the bell rung other than as they had stated is not necessarily what is termed negative evidence. If they were situated at a given instant of time where they could hear the whistle blown and the bell rung, and we think the evidence so shows, and if they did not hear them, the evidence is rather in the nature of affirmative proof that the whistle was not sounded nor the bell rung after leaving the whistling post.

The above statute has been several times construed by the Supreme Court of Minnesota to mean that either the whistle must be sounded or the bell rung, as the engine approaches dangerous crossings. In other

words, these decisions plainly hold that it is not sufficient to sound the whistle to ring the bell 80 rods from the crossing, but that the whistle must be sounded or the bell rung intermittently or at intervals as the engine and train approaches and passes over the crossing. Hendrickson v. G. N. Ry. Co., 49 Minn. 245, 51 N. W. 1044, 16 L. R. A. 261, 32 Am. St. Rep. 540; Heininger v. G. N. Ry. Co., 59 Minn. 462, 61 N. W. 558; Newstrom v. St. Paul & Duluth Ry. Co., 61 Minn. 79, 63 N. W. 253; Hohl v. Chicago, Milwaukee & St. Paul Ry. Co., 61 Minn. 325, 63 N. W. 742, 52 Am. St. Rep. 598; Libaire v. Minneapolis & St. Louis Ry. Co., 113 Minn. 520, 130 N. W. 8; 4 Am. & Eng. (1st ed.) 919, subd. 15.

The statutory provisions, which require the ringing of the bell and the blowing of the whistle on approaching a public crossing are not necessarily the sole measure of the duty of the railway company to protect persons and property at such crossings. Coulter v. G. N. Ry. Co., 5 N. D. 568, 67 N. W. 1046; Wilson v. Railway Co., 161 Iowa, 191, 142 N. W. 59; Kinyon v. C. C. N. W. Ry. Co., 118 Iowa, 349, 92 N. W. 40, 96 Am. St. Rep. 382. If the view of the crossing is obstructed by various objects, such as buildings, hills, trees, brush, or other growth, the giving of the statutory signals at the given distance should not be held as an exercise of due care on the part of the railway company in protecting life and property endangered at such crossings. On the other hand, it should use every caution to protect against the injury and destruction of lives and property at such crossings. Indeed, it may be a matter of grave doubt whether, in any event, the defendant can show it is not negligent, and that its negligence is not the proximate cause of the injury, where a crossing is so extremely dangerous as to be a continual menace to the lives of travelers on the highway, who must use such crossing.

The instructions requested by defendant were properly refused. There is but one of them that needs any discussion; is it as follows:

"You are instructed under the statute of the state of Minnesota which controls here any recovery which may be had goes to the surviving husband and children of Mary Cure, and is distributed one-third to the husband and two-thirds to the children. The proof here shows no recovery can be had in behalf of the surviving husband; therefore, any verdict you may return cannot be in excess of $5,000."

The statute referred to is § 8175, General Statutes of Minnesota, which provides that the damages in an action for death by a wrongful act or omission cannot exceed $7,500, and shall be for the exclusive benefit of the surviving spouse and next of kin, to be distributed to them

in the same proportion as person property of persons dying intestate. The Supreme Court of Minnesota, however, has held, in substance, that the damage recovered in such action is no part of the estate of the deceased, and that the probate court does not have jurisdiction to make distribution of the amount recovered as if the same were the personal property of one dying intestate; that the cause of action is one given to the personal representative of the deceased, and that it might have been given to any other person or public officer in trust for the widow and next of kin, or directly to one of them in trust for all. It has been held that the distribution thereof rests exclusively with the district court in which recovery is had. Aho v. Republic Ore & Steel Co., 104 Minn. 332, 116 N. W. 590, Mary Mayer v. Hannah Mayer, 106 Minn. 484, 119 N. W. 217, State ex rel. Scannell v. District Court of Ramsey County, 114 Minn. 364, 131 N. W. 381. In re Riccomi's Estate, 185 Cal. 458, 197 Pac. 97, 14 A. L. R. 509. See notes 14 A. L. R. 509.

We think the full amount of the damages, not exceeding $7,500, could be recovered where there is evidence to warrant a recovery to that extent, even though, as in this case, the surviving husband may not be entitled to any share thereof. In any such recovery the distribution of the damages recovered is left entirely to the district court, and in this case it can and perhaps would distribute the whole amount to the children, as damages suffered by them. They not only had a pecuniary interest in the continuance of the life of their mother, who had in reality become the head of the family, but by her death they lost her daily services, attention, devotion, association, and care, and in this case these are proper elements of damages.

It is strenuously contended by defendant that it was negligence to have the number in the automobile which were in it. They are referred to as people, which is incorrect; there were two people, A. E. Cure and Mary Cure in the car; the others were children, and were sitting therein in the position hereinbefore stated. Taking into consideration their ages and the way they were seated in the car, and further, that there is no evidence tending to show that the driver was crowded or inconvenienced, nor obstructed thereby in driving the car, it cannot be said as a matter of law that the number who occupied the car constituted negligence. That question, as well as all questions of negligence or contributory negligence, were for the jury to decide, and in this respect it found adversely to the defendant.

The damages returned by the verdicts of the jury in the various.

cases are as follows: The Dakota Trust Company case, $7,500; A. E. Cure, $1,200; Helen Cure, $2,700; Madeline Cure, $2,166; Amenia-Sharon Land Co., $1,090.53. We think the evidence is sufficient to show that these sums are not in reality more than compensatory damages. The injuries were severe and painful; the expense on account of physicians, hospital, and nurse bills was large; the mother was taken from her children at the very time and thenceforth when they most urgently needed her care, services, and attention. The evidence clearly shows that the damages to the automobile equal or exceed that returned in the special verdict in that case. Each verdict is well sustained by the evidence.

BRONSON, J., concurs.

BIRDZELL, J. In these cases there are two questions which, to the writer, seem controlling: First, was there any evidence of negligence on the part of the defendants which may be said to have been the proximate cause of the injuries sustained? Second, under the evidence, was there a question of fact for the jury as to the existence of contributory negligence? The first question I regard as being a close one, but I am not prepared to say that, in view of all of the circumstances, which are fully set forth in the opinion of Mr. Chief Justice Grace, there was not substanital evidence from which the jury might find, as they did find, that the defendant did not use due care in approaching the crossing. I therefore concur in the principal opinion in its holding upon this question, as well as upon the other questions affecting the judgments, aside from the question of contributory negligence.

With reference to the manner in which the driver, A. E. Cure, approached the crossing, he testified as follows:

"Q. Approximately how fast were you traveling in your car coming along the road there? A. I presume about 15 to 20 miles an hour. * * *

"Q. Could you see any train, or was there any train? A. I saw no train whatever; and then as we drove aong and as we started to turn to go up on the grade I looked again, and I was listening, and I looked, and I saw nothing but a bunch of brush there; then as we drove along I looked north to see if there was any train, and at that time we were getting pretty close to the track, but there was no train coming from the north; then Harold says, 'There is a train,' and I looked, and the train was right

on us; we was right on the track, and the train was right on us. * * *

"Q. Did you hear any noise to indicate that a train was coming until Harold said, 'Here's the train'? A. I did not.

"Q. About how far, Mr. Cure, from the crossing was the last point at which you coud see the track, about how far south? A. I presume about 200 feet. * * *

"Q. At what point did you last look back at the track, Mr. Cure? A. Last?

"Q. Yes. A. I presume about 200 feet.

"Q. While you were running parallel to the track? A. Yes."

On cross-examination he testified:

"Q. How many times had you been over this road in the summer of 1920? A. Do you mean this road where the accident occurred?

"Q. Yes, and before the accident? A. Three times, I believe.

"Q. How many times had you been over it in the sumer of 1919? A. I think it was only once; I think we went that way only once. * * *

"Q. You knew the crossing was there? A. Yes; I knew there was a crossing there.

"Q. And you had made at least four round trips over that crossing? A. No; I had made two, and this one would be the third trip.

Q. Round trips? A. Round trips. * * *

"Q. You have testified you looked when you were about 200 feet from the crossing? A. Yes. * * *

"Q. Do you mean to testify this was the only point where you could see the track between where you left the cut and the railroad crossing? A. That is the only point you could see the track, I believe.

"Q. Well, you don't know that at all, do you; you don't know that as a fact, do you? A. Yes; I believe I do.

"Q. You say you were driving along there that day about 15 or 20 miles an hour? A. I presume so. * * *

"Q. You didn't stop your car at any time and look back, or look up the track or towards the track, did you? A. No; I did not.

"Q. You just kept on going at about the same rate of speed, didn't you? A. Yes. * * *

"Q. As you turned the corner there to go up on the track, I believe you already said you looked right into the brush there? A. Yes; I looked into brush there on the corner.

"Q. Could you see the track to the south at that time? A. At that time: no, sir.

"Q.  Do you know whether or not you could see the train looking at that point?  A. I don't believe that I could.

"Q.  You don't know that as a matter of fact, do you?  A. Yes; I think, I know I couldn't see a train at that point. * * *

"Q.  Did you ever stop at that point and look up the track for the train?  A. No, sir.

"Q.  This point was about how far from the crossing?  A. Only about 175 feet.

"Q.  And when you got near the crossing, say at a distance of 90 feet, do you know whether or not you could see the track to the south?  A. No; we could not.

"Q.  Sure you couldn't?  A. I am sure I couldn't at that distance.

"Q.  And from the time you looked there as you turned the corner you never looked again to the south until Harold called as you testified?  A. No; I did not.

"Q.  So you run that 175 feet without looking to the south until Harold called you; that is right, is it?  A. Yes, sir.

"Q.  Was your machine in good shape that day?  A. Yes, sir.

"Q. Brakes working in good shape?  A. Yes, sir.

"Q.  It takes quite a long time to stop a machine running from 15 to 20 miles an hour, does it?  A. Well, it would take 30 or 40 feet, probably 50.

"Q.  And you knew that at the time you went up on that track, you knew that you couldn't stop your machine when running 15 to 20 miles an hour in less than 30 feet and possibly 50 feet; is that right?  A. Yes.

"Q.  With one's car running at 15 miles an hour say, you think it would take 30 feet to stop it on that road?  A. Yes.

"Q.  With one's car running at 10 miles an hour, how long would it take to stop that car on that road?  A. Well, it would take a little less time.

"Q.  How many feet approximately in your judgment?  A. Thirty feet, probably. * * *

"Q.  Would it take more than 10 feet to stop a car going at a speed of 10 miles an hour at that place and up that embankment with the emergency brake?  A. No; it probably wouldn't.

"Q.  Well, what distance could you stop in?  A. Well, probably about 15 feet."

On redirect examination, he testified:

"Q.  Just one thing more, Mr. Cure; you have spoken all the way

through here about your going along at the rate of 15 or 20 miles an hour; what was the fact after you turned the curve and started to go up the hill as to how fast you were going?

"Mr. Conmy: That is objected to as leading and suggestive. The witness has testified at least a dozen times as to the speed, and testified his continuous speed was 15 to 20 miles an hour, and we object to any further leading examination.

"The Court: The objection is overruled.

"A.   About 10 or 15 miles per hour.

Cross-examination by Mr. Conmy:

"Q.   Didn't you tell me, Mr. Cure, at least three times, at least three different times, that you continued about the same speed of 15 to 20 miles an hour all the time up to the time the accident occurred?   A. I didn't intend to.

"Q.   Well, didn't you tell me that three different times?   A. I don't remember that I did.

"Q.   You don't remember that?   A. No, sir.

"Q.   You want to testify now you were going about 15 miles an hour?   A. From the time I turned the curve to go up the hill 15—10 to 15 miles an hour."

It would seem that a fair construction of this testimony is that the driver, as he approached the track, after turning, continued at approximately the same rate of speed or possibly a little slower than he had been driving while he was running parallel with the railroad track; that he was somewhat familiar with the crossing, and knew that he could not see a train approaching, on account of the obstruction to his vision, until he would be quite close to the track; and that he did not have his car under such control that he would be able to stop it if he should see a train coming, before he was upon the track.   This being true, I am of the opinion that he was necessarily guilty of contributory negligence.

While it is settled law in this jurisdiction that a driver of an automobile is not ordinarily required to stop, look, and listen before crossing a railroad track (Pendroy v. Great Northern Ry. Co., 17 N. D. 433, 117 N. W. 531), the driver may nevertheless be guilty of contributory negligence if he approaches, disregarding dangers that he could readily avoid by the exercise of caution.   The driver of an automobile, knowing that he is approaching a railroad crossing, must be held to a realization that a train, if in the vicinity, necessarily has the right of way; and where the view of the track is obscured, as it was in the instant case, the driver's

knowledge of possible danger places upon him the duty of approaching the place of danger with greater caution than he would be required to exercise if his view were unobstructed.  It seems to me impossible and inconsistent with reason to say or to find that a driver approaching a railroad crossing at a rate of speed in excess of 10 miles per hour, without stopping or slackening his speed sufficiently to determine the approach of a train, which, owing to obstructions, he could not see before reaching the danger zone, was exercising reasonable care for his own safety and the safety of those who were accompanying him.

"The tendency of the law," says Berry on Automobiles (3d ed.) § 682, p. 660, "is to exact greater care of those crossing railroad tracks as the consequences of a collision with a train become more serious.  On account of the great danger, not only to the occupants of the automobile, but to the passengers on the train, likely to result from a collision between a train and an automobile, the care exacted of a motorist is correspondingly great."

The same author quotes from the opinion in New York Central & H. Ry. Co. v. Maidment, 168 Fed. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794, as follows:

"With the coming into use of the automobile, new questions as to reciprocal rights and duties of the public and that vehicle have and will continue to arise.  At no place are these relations more important than at the grade crossings of railroads.  The main consideration hitherto with reference to such crossings has been the danger to those crossing.  A ponderous, swiftly moving locomotive, followed by a heavy train, is subjected to slight danger by a crossing foot passenger, or a span of horses and a vehicle; but, when the passing vehicle is a ponderous steel structure, it threatens, not only the safety of its own occupants, but also those on the colliding train.  And when to the perfect control of such a machine is added the factor of high speed, the temptation to dash over a track at terrific speed makes the automobile, unless carefully controlled, a new and grave element of crossing danger.  On the other hand, when properly controlled, this powerful machine possesses capabilities contributing to safety.  When a driver of horses attempts to make a crossing and is suddenly confronted by a train, difficulties face him to which the automobile is not subject.  He cannot drive close to the track, or stop there, without the risk of his horse frightening, shying, or overturning his vehicle.  He cannot well leave his horse standing, and if he goes forward to the track to get an unobstructed view and look for coming trains, he

might have to lead his horse or team with him. These precautions the automobile driver can take, carefully and deliberately, and without the nervousness communicated by a frightened horse. It will thus be seen an automobile driver has the opportunity, if the situation is one of uncertainty, to settle that uncertainty on the side of safety, with less inconvenience, no danger, and more surely than the driver of a horse. Such being the case, the law both from the standpoint of his own safety and the menace his machine is to the safety of others, should, in meeting these new conditions, rigidly hold the automobile driver to such reasonable care and precaution as go to his own safety and that of the traveling public. If the law demands such care, and those crossing make such care, and not chance, their protection, the possibilities of automobile crossing accidents will be minimized."

See, also, Corbett v. Hines (Iowa) 180 N. W. 690; Pogue v. Great Northern Ry. Co., 127 Minn. 79, 148 N. W. 889; Cathcart v. Oregon-Wash. R. & Nav. Co., 86 Or. 250, 168 Pac. 308.

I am of the opinion further that the contributory negligence of the driver is not imputed to the other occupants of the car. Thomas v. Ill. Cent. Ry. Co., 169 Iowa, 337, 151 N. W. 387; Howe v. Cent. Ver. Ry. Co., 91 Vt. 485; 101 Atl. 45; Berry on Automobiles (3d. ed.) § 502.

For the foregoing reasons I concur in the opinion of Mr. Chief Justice Grace and in the order of affirmance, affirming the judgments in the cases of Dakota Trust Co. v. Mpls., St. P. & S. St. M. Ry. Co., Helen Cure v. Mpls., St. P. & S. St. M. Ry. Co., Madeline Cure v. Mpls., St. P. & S. St. M. Ry. Co. In the cases of A. E. Cure v. Mpls., St. P. & S. St. M. Ry. Co. and Amenia & Sharon Land Co. v. Mpls, St. P. & S. St. M. Ry. Co. I concur in the order of reversal and dismissal.


CHRISTIANSON, J. The grounds of negligence set forth in the complaint in this case are that—

"As the automobile in which plaintiff was riding reached said public crossing defendant carelessly and negligently ran one of its locomotives with a train of cars attached across said road at said crossing at a great, dangerous, and negligent rate of speed, and without a warning of any kind, and without ringing the bell or sounding the whistle upon said locomotive, or causing the same to be rung or sounded within 80 rods from such crossing, and failed to continue the ringing of such bell and the sounding of such whistle at intervals until said locomotive and the train

thereto attached had completely crossed said road, in violation of § 5001 of the Revised Laws of the state of Minnesota for the year 1905, and the amendments to the revisions of said act and in violation of other laws of the state of Minnesota, and in spite of the fact that said crossing was, as defendant well knew, a dangerous crossing, and one of which passengers upon the public highways had no view until they were almost upon the same, and without a proper and careful lookout being kept by the engineer of said train."

Section 5001, Revised Laws of Minnesota for 1905, reads as follows:

"Every engineer, driving a locomotive on any railway, who shall fail to ring the bell or sound the whistle upon such locomotive, or cause the same to be rung or sounded, at least eighty rods from any place where such railway crosses a traveled road or street, on the same level (except in cities), or to continue the ringing of such bell or sounding of whistle at intervals until such locomotive and the train thereto attached shall have completely crossed such road or street, shall be guilty of a misdemeanor."

The answer puts in issue the allegations of the complaint, and also alleges as an affirmative defense that the injuries sustained were occasioned by the negligence of the driver of the automobile, and that the various parties injured were guilty of contributory negligence.

The case was submitted to the jury for a special verdict, and the judgment appealed from rests upon the special verdict, which is set forth in the opinion prepared by the Chief Justice. As appears from such verdict, plaintiff's recovery purports to be based upon the negligence of the defendant (1) in operating the train at an excessive rate of speed, and (2) in failing to give proper signals. It will be noted that the special verdict does not find whether the defendant did or did not violate the Minnesota statute mentioned in the complaint, nor does the verdict find the rate of speed at which the train was being operated. It will be noted further that the defendant requested that specific questions be submitted as to whether the signals required by the laws of Minnesota to be given by a train approaching a crossing had or had not been given. It seems to me that these questions were proper, and should have been submitted; for one of the grounds of negligence alleged in the complaint was violation of the Minnestoa statute. The trial court, however, refused to submit such questions. The trial court further instructed the jury that the failure to give the statutory signals "would be a fact and circumstance" for the jury to consider, "along with all the other evidence in the case, in determining whether or not the defendant

was guilty of negligence." There was positive and convincing evidence on the part of the defendant tending to show that the statutory signals were given, and the findings of the jury are not inconsistent with the fact that such signals were given. A special verdict will be construed most strongly against the party upon whom rests the burden of proof. Silence in respect to a controverted material fact not specially found or necessarily included in the verdict is equivalent to an express finding against such party. Clementson on Special Verdicts, pp. 267, 268. The positive testimony of the trainmen is to the effect that at the time of the collision the train was traveling at a rate of speed of from 20 to 25 miles an hour. There is no evidence that it was traveling at any greater speed, nor is there any evidence tending to show that the rate of speed at which the train was traveilng was an unusual one. Hence, so far as the special verdict in this case is concerned, we have this situation: It must be assumed that the railway company gave the statutory signals, and that the train was being operated at a rate of speed at which such trains are usually being operated. Under the circumstances I fail to see wherein the verdict justifies the rendition of judgment against the defendant.